UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MASSAPEQUA UNION FREE SCHOOL
DISTRICT, et al.,

      Plaintiffs,


   v.


NEW YORK STATE BOARD OF REGENTS,
et al.,


      Defendants.    **MEMORANDUM**
-----------------------------------------------------------------X  **AND ORDER**
NATIVE AMERICAN GUARDIAN'S    23-CV-7052-SJB-LGD
ASSOCIATION and DAVID FINKENBINDER,  25-CV-3008-SJB-LGD


      Plaintiffs,


   v.


NEW YORK STATE BOARD OF REGENTS,
et al.,


      Defendants.
-----------------------------------------------------------------X
**BULSARA, United States District Judge:**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 3

BACKGROUND ................................................................................................. 6

   I.   PART 123 ...................................................................................................... 6

   II.   THE MASSAPEQUA PLAINTIFFS ............................................................... 9

   III.   THE NAGA AGREEMENT AND LAWSUIT .................................................. 15

DISCUSSION ................................................................................................. 20

   I.   THE MASSAPEQUA PLAINTIFFS' MOTION TO AMEND ............................ 20

   II.   MASSAPEQUA AND THE BOARD'S CAPACITY TO SUE .......................... 26

   III.   ELEVENTH AMENDMENT IMMUNITY ....................................................... 33

   IV.   ARTICLE III STANDING .......................................................................... 36

      A.   First Amendment Claims .................................................................. 39

      B.   NAGA's Equal Protection Claim ...................................................... 64

      C.   NAGA's Due Process Claim ............................................................ 68

      D.   Dormant Commerce Clause .............................................................. 71

      E.   Indian Commerce Clause .................................................................. 74

      F.   Title VI and Title VII Claims ............................................................ 78

      G.   Claims Under Sections 1981 and 1983 ............................................ 86

   V.   BILL OF ATTAINDER .............................................................................. 87

CONCLUSION ................................................................................................. 90

INTRODUCTION

The New York State Board of Regents adopted Part 123, a regulation that bans the use of Native American symbols and imagery as public school mascots in New York.  For over two years, the Massapequa Union Free School District has been trying to block the law and to retain its right to use its "Chiefs" mascot at sporting events and school functions.  If Massapequa fails to comply with Part 123, it faces serious consequences, including a loss of funding from New York State and removal of school officials.

Part 123 may have serious constitutional defects.  It appears to enact a legal classification based on race or ancestry, which subjects it to the most demanding form of judicial scrutiny.  The law may also abridge the First Amendment free speech rights of Massapequa School Board members and District employees.  These difficult questions, however, are not the subject of this opinion.

This opinion concerns itself almost exclusively with the constitutional requirement of standing.  Standing requires that a plaintiff in federal court have their own injury; they generally cannot sue to vindicate the rights of other parties or people, or sue on the basis of a future, speculative, or illusory injury.  This limitation "prevents 'concerned bystanders' from abusing the federal courts as a forum to air their 'generalized grievances' against state actions."[1]  In other words, no matter how

---

[1] *Doe v. Hochul*, 139 F.4th 165, 177 (2d Cir. 2025) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013)).

unconstitutional or illegal a law may be, not just anyone can walk into federal court to block its enforcement.

Several of these claims were addressed in copious detail by Chief Judge Margo Brodie.  Earlier this year, Judge Brodie dismissed Massapequa's lawsuit, in large part because the District and its Board lacked the capacity to sue the State of New York, which created the District and to which it ultimately answers.  A member of Massapequa's Board, Jeanine Caramore, who also brought claims in her individual capacity, was permitted to try to fix the procedural and pleading failures that derailed the prior suit.

Massapequa and its Board were not granted leave to amend their claims, so they now seek the Court's permission to do so.  But rather than making an effort to solve the problems Judge Brodie identified, unfortunately, they have recycled their prior allegations almost word for word and added a host of new claims that resemble constitutional word salad.  Terms like equal protection, the Commerce Clause (dormant and Indian), Title VI, Title VII, and prior restraint are asserted and paired with seminal cases of constitutional law in briefs in conclusory fashion, with little analysis or explanation.  This approach fails to cure their incapacity to sue New York State and standing problems.  Suffice it to say, the pleading deficits that derailed Massapequa's first attempt have not been remedied, and those problems infect each of the new claims.

There is a new element.  Massapequa joined forces with a non-profit association, the Native American Guardian's Association ("NAGA") and entered into a contract by which NAGA supposedly gave the District rights to continue to use the "Chiefs"

mascot.  Based on that contract, NAGA, along with one of its members, David Finkenbinder, brought its own lawsuit seeking to enjoin enforcement of Part 123.

NAGA's entry onto the scene was a clever attempt to cure Massapequa's standing problems and its inability to sue the State of New York.  Invalidation of a contract is often an automatic entry into federal court, since the loss of the benefits from an agreement is an injury that is concrete and potentially immediate.  But here, the document that the parties call a contract in this case is anything but.  It does *nothing*. NAGA contracted to allow Massapequa to use the Chiefs mascot—but NAGA does not own the mascot or have any rights to it.  And Massapequa has never needed NAGA's permission to use the Chiefs mascot.  There are yet more features that reflect the illusory nature of this contract: neither party can sue the other for breach, and either party can elect to cancel the entire contract if Part 123 prevents Massapequa from using the Chiefs mascot.  In other words, it is a contract in name only, and its invalidation gives rise to no injury and cannot confer standing.

All this procedural maneuvering—which included filing a third lawsuit and filing, but later abandoning, an appeal—is unfortunate.  It has prevented the timely resolution of the claims of the one party who has had standing from the start: Jeanine Caramore, a current School Board member who wishes to use the Chiefs mascot in her reelection campaign and as a form of political protest, and who contends the law infringes her First Amendment rights.  As explained herein, Caramore is permitted to amend her complaint to bring three First Amendment challenges to Part 123.

But for the overwhelming majority of the claims in these two cases, the parties lack the capacity to sue or standing (or both). Other claims are barred by the Eleventh Amendment's immunity for states sued in federal court. Massapequa, its Board, NAGA, and Finkenbinder, and their claims, are dismissed, and because all their claims are dismissed, NAGA's request for a preliminary injunction is also denied. Because standing implicates subject-matter jurisdiction, and capacity to sue is a curable defect, each of these dismissals is without prejudice. However, Massapequa and its Board, having had multiple attempts to file a complaint that survives dismissal, are denied further leave to amend. And while NAGA could file another complaint, having failed to allege a cognizable claim only once, it and Finkenbinder should consider permitting the litigation to go forward on the viable First Amendment claims that have existed from the beginning and that have been asserted by the one Plaintiff, Caramore, who indisputably has standing to sue.

<u>BACKGROUND</u>

I.    <u>Part 123</u>

In 2010, New York State enacted the Dignity for All Students Act, which "prohibits bullying, harassment, discrimination, and cyberbullying against students in school or at school functions based on their actual or perceived membership in a protected class." (*See Massapequa Union Free Sch. Dist. v. N.Y. State Bd. of Regents*, No. 23-CV-7052 ("*Massapequa*"), Proposed Second Am. Compl. filed May 19, 2025 ("Massapequa PAC"), attached to Defs.' Mot. for Leave as Ex. A, Dkt. No. 66-2 ¶¶ 60–61). In late 2022, New York State Education Department ("SED") said that it was

6

developing regulations to codify a policy prohibiting public school districts from using Indigenous team names, imagery, and mascots. (*See id.* ¶¶ 78–79). After a public comment period, the State Board of Regents voted to adopt Part 123, which became effective on May 3, 2023. (*Id.* ¶ 87; *see also Massapequa Union Free Sch. Dist. v. N.Y. State Bd. Of Regents*, No. 23-CV-7052, 2025 WL 929710, at *3 (E.D.N.Y. Mar. 27, 2025) [hereinafter *Dismissal Order*]; N.Y. Comp. Codes R. & Regs., tit. 8 ("8 NYCRR"), §§ 123.1–123.5 ("Part 123").[2]

Part 123 provides that "no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction." 8 NYCRR § 123.2. Part 123 defines "Indigenous name, logo, or mascot" as "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such schools['] sports teams." *Id.* § 123.1. The regulation "does not [apply to] a public school, school building, or school district named after an Indigenous tribe." *Id.*

Part 123 required boards of education in New York to "commit, via resolution, to eliminating use of all Indigenous names, logos, and mascots by the end of the 2022–[20]23 school year." *Id.* § 123.3(a). These resolutions were required to "identify a plan to eliminate all use of the prohibited name, logo, or mascot within a reasonable time"

---

[2] The following description of Part 123 tracks Judge Brodie's prior order. *See Dismissal Order*, 2025 WL 929710, at *3–*4.

which could be "no later than the end of the 2024–2025 school year."[3]  *Id.*  The deadline

for these resolutions was June 30, 2023.  (Massapequa PAC ¶ 88).  Part 123 separately

requires public schools to "prohibit school officers and employees when located on

school property or at a school function from utilizing or promoting any Indigenous

name, logo, or mascot."  8 NYCRR § 123.5.

      Part 123 contains several exceptions.  *First*, it allows New York public schools to

utilize an Indigenous mascot[4] if "a written agreement exist[ed] prior to the effective

date of [Part 123] between a federally recognized tribal nation within the State of New

York or a New York State recognized tribal nation and a public school permitting the

use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe."

8 NYCRR § 123.4(b).  Agreements entered into after May 3, 2023 fall outside this

protection.  *Second*, it allows recognized tribal nations to "choos[e] to use an Indigenous

---

[3] The Massapequa Board passed what it describes as a "forced resolution," (Massapequa PAC ¶ 89):

> [T]he District Board of Education passed a resolution with a plan to eliminate the use of prohibited Indigenous names, mascots, and logos by the end of the 2023-2024 school year. The resolution makes clear, however, that the Board of Education's compliance shall in no way serve as a waiver or be construed as a waiver of the District's right to, among other things, challenge (a) whether the use of the "Chiefs" name does in fact constitute a prohibited "Indigenous name, logo or mascot" pursuant to Part 123, and (b) whether Part 123 should be repealed and/or determined to be unenforceable by the Commissioner and/or any court of competent jurisdiction.

(*Id.* ¶ 88.)

[4] From here on, the Court generally uses the term "mascot" or the phrase "Indigenous mascot" to mean the full range of items covered by Part 123: names, logos, and mascots.

name, logo, or mascot for a sports team comprised of its tribal members, including . . . a

tribal school or intramural league." *Id.* § 123.4(a). *Third*, it allows "any school officer or

employee who is a member of a tribal nation" to "utiliz[e] or promot[e] an Indigenous

name, logo, or mascot of such tribal nation." *Id.* § 123.5.

In May of 2023 the SED issued further guidance in a frequently asked questions

("FAQ") document. (Massapequa PAC ¶¶ 286–87); *see also* N.Y. State Dep't of Educ.,

Background and Frequently Asked Questions Regarding Part 123 of the Regulations of

the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names,

Mascots, and Logos by Public Schools (May 2023) [hereinafter Part 123 FAQ].[5] The FAQ

stated that districts that have at any time associated with Indigenous mascots would

have to implement changes under Part 123. (Massapequa PAC ¶ 287).

Failure to comply with Part 123 may result in "removal of school officers, or as a

last resort, withholding of State Aid, pursuant to Education Law § 306[2]." Part 123

FAQ at 9. New York law provides for the removal from office of any school officer who

willfully disobeys a regulation of the Regents or Commissioner of Education, "after a

hearing at which the school officer shall have the right of representation by counsel," or

the withholding of state funds from a district or city for willful disobedience of a

regulation. N.Y. Educ. Law § 306.

II.    The Massapequa Plaintiffs

Massapequa Union Free School District ("Massapequa"), the Massapequa Union

Free School District Board of Education ("the Board"), and Jeanine Caramore

---

[5] The FAQ is available at: https://perma.cc/WKW5-45UP.

("Caramore") both in her official capacity as a Board member and her individual capacity (collectively, "Massapequa Plaintiffs"), commenced their challenge on September 21, 2023, and filed their first Amended Complaint on January 16, 2024. (*Massapequa*, Compl., Dkt. No. 2; *Massapequa*, Am. Compl. ("Massapequa Am. Compl."), Dkt. No. 24).

The First Amended Complaint was brought against the New York State Board of Regents, as well as its members in their official capacities (the same members named in the PAC currently before the Court).  (Massapequa Am. Compl. at 1).  All the Massapequa Plaintiffs brought claims against all Defendants under the New York State Administrative Procedures Act for violating the notice-and-comment requirement, (*id.* ¶¶ 101–10), as well as allegations of state and federal constitutional separation-of-powers violations, (*id.* ¶¶ 123–33).  There were two categories of First Amendment claims.  First, all the Massapequa Plaintiffs brought a vagueness and overbreadth challenge to Part 123.  (*Id.* ¶¶ 134–49).  They claimed the regulation failed to clearly define what conduct it prohibited, encouraged arbitrary and discriminatory enforcement, (*id.* ¶¶ 140–44), and imposed viewpoint and content restrictions on "a substantial amount of constitutionally protected First Amendment activity," (*id*. ¶ 148). Second, Caramore alone alleged that Part 123 impermissibly prohibited her from wearing Chiefs apparel on school grounds or at school functions.  (Massapequa Am. Compl. ¶¶ 150–71).  Defendants moved to dismiss all the claims, while the plaintiffs sought a preliminary injunction.

Judge Brodie dismissed the First Amended Complaint in its entirety but granted Caramore leave to amend her First Amendment freedom of speech and overbreadth claims, if she refiled them in her personal capacity. *See Dismissal Order,* 2025 WL 929710, at *35.[6]

Judge Brodie concluded that Massapequa and the Board, as municipal entities, lacked the capacity to sue New York State, and they failed to plead that any of the exceptions to that prohibition applied. *Id.* at *8–*9.

As for Caramore, who sued as both a Vice President of the Board and as a parent of a current District student, Judge Brodie first dismissed her vagueness challenge. *Id.* at *13–*17. Caramore failed to plausibly allege that Part 123 provided insufficient notice or that it was arbitrary or discriminatory as applied: it did not allege "that no set of

---

[6] Judge Brodie's Dismissal Order addressed three related lawsuits together. Along with Massapequa's case, her decision dismissed one case brought by the Wantagh and Wyandanch School Districts, and another brought by the Connetquot Central School District. *See Wantagh Union Free Sch. Dist. v. N.Y. State Bd. of Regents*, No. 23-CV-7299, 2025 WL 929710 (E.D.N.Y. Mar. 27, 2025); *Connetquot Cent. Sch. Dist. v. N.Y. State Bd. of Regents*, No. 23-CV-7696, 2025 WL 929710 (E.D.N.Y. Mar. 27, 2025). Though the individual Board member plaintiffs across all the cases were granted leave to amend and bring their claims in an individual capacity, they elected to not do so. The Connetquot Plaintiffs appealed to the Second Circuit, but the District and Board then withdrew their claims; the appeal is proceeding only with respect to Plaintiff Jaclyn Napolitano-Furno in her official and individual capacities. *See* Order Granting Mot. to Withdraw Appeal, *Napolitano-Furno v. N.Y. State Bd. of Regents*, No. 25-1137 (2d. Cir. Sep. 24, 2025), Dkt. No. 33. The Wantagh and Wyandanch appeal is pending. *See* Scheduling Order, *Wantagh Union Free Sch. Dist. v. N.Y. State Bd. of Regents*, No. 25-1136 (2d. Cir. Aug. 20, 2025), Dkt. No. 26. There was also a fourth case, but Amityville voluntarily dismissed its case. *See* Notice of Voluntary Dismissal, *Amityville Union Free Sch. Dist. v. N.Y. State Bd. of Regents*, No. 23-CV-8011 (E.D.N.Y. Oct. 14, 2024), Dkt. No. 42.

11

circumstances exists under which the regulation would be valid." *Id.* at *16–*17 (quotation omitted).

As to Caramore's overbreadth challenge, Judge Brodie ruled that she failed to allege that Part 123 implicated protected speech. *Id.* at *20 ("[She has] failed to plead sufficient facts . . . [that] the conduct of such school officials and employees is on a matter of public concern and therefore within the scope of the First Amendment's protection."). In light of these pleading deficiencies, Judge Brodie dismissed the claims but granted Caramore leave to amend. *Id.*

With respect to her other First Amendment claim, Caramore "spoke as [a private] citizen[]," when she wore Chiefs apparel at school events, which would ordinarily entitle her to bring a First Amendment challenge to Part 123. *Dismissal Order*, 2025 WL 929710, at *26. However, Caramore failed to allege she was "speaking on a matter of public concern," which made it impossible for her to claim a First Amendment violation. *Id.* at *27. But she was granted leave to amend. *Id.*

The Court dismissed the federal separation-of-powers claim because plaintiffs failed to make any arguments in support of it and because it does not apply against the states. *Id.* at *28 n.27. Finally, the Court declined to exercise supplemental jurisdiction over the state law claims, including the separation-of-powers claim and the State Administrative Procedure Act claims. *Id.* at *4, *28.

Now pending before the Court is the Massapequa Plaintiffs' motion for leave to file their PAC, which seeks a declaratory judgment annulling Part 123. (*See* Massapequa PAC ¶ 1). The PAC sets out the histories of Native American tribes in the

surrounding area, noting that the Massapequa name is derived from Native roots. (*Id.* ¶ 37). Plaintiffs allege that the Chiefs mascot was created around 1925 alongside the opening of the first school in Massapequa, and it depicts Sachem Tackapausha, a revered chief of one of the 13 tribes known as the Massapequas. (*Id.* ¶¶ 39–43). Massapequa has no "mascot" beyond the "logo": "there is no Chiefs costume." (*Id.* ¶ 45). The PAC recites a statement from the Board that the Chiefs mascot "honors Chief Tackapausha," and notes that the mascot is principally about "honor and respect." (*Id.* ¶¶ 57–58).

The PAC contains three First Amendment claims. Massapequa, the Board, and Caramore (in her individual capacity) reassert a First Amendment overbreadth claim, alleging that Part 123 "will chill the expressive activity of every future District employee" who cannot wear Chiefs apparel on school property. (Massapequa PAC ¶¶ 121, 116–26 ("First Cause of Action")).[7] Caramore also brings her own separate First Amendment claim in her individual capacity, alleging that Part 123 infringes on her expressive conduct of wearing Chiefs apparel, which she affiliates "with pride and respect," and which she has done for the last two years "to protest Part 123" and "support the District's ongoing fight to maintain the Chiefs name and logo." (*Id.* ¶¶ 141, 154, 127–67 ("Second Cause of Action")). Finally, each of the Massapequa Plaintiffs brings what can be described as a political speech First Amendment claim, alleging that Part 123 restricts incumbent Board members who are not members of a

---

[7] Although the Massapequa PAC does not specify which Plaintiffs bring the first cause of action, as it does for each subsequent claim, the Court analyzes the claim as brought on behalf of Massapequa, its Board, and Caramore.

tribal nation from "engaging in protected political expression during campaigns, including wearing apparel . . . bearing the school's Indigenous name" at traditional campaign forums like school events.  (*Id.* ¶¶ 171, 168–213 ("Third Cause of Action")).  Caramore brings this Third Cause of Action in her individual capacity.[8]

The PAC otherwise departs from the dismissed Amended Complaint in several ways.  *First*, the New York State Board of Regents is no longer a defendant—instead, only its members are named, all in their official capacity.  (*Massapequa*, Proposed Second Am. Compl. with Redlines filed May 19, 2025, attached to Mot. for Leave as Ex. B, Dkt. No. 66-3 at 1).  *Second*, there are six new causes of action for violations of: Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, (Massapequa PAC ¶¶ 183–213); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), (*id.* ¶¶ 214–31); 42 U.S.C. § 1981, (*id.* ¶¶ 232–46); the dormant Commerce Clause, U.S. Const. art. I, § 8, cl. 3, (*id.* ¶¶ 247–61); the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, (*id.* ¶¶ 262–76); and the state Bill of Attainder Clause, U.S. Const. art. I, § 10, cl. 1, (*id.* ¶¶ 277–91).  These claims are brought by all three Massapequa Plaintiffs—the District, its Board, and Caramore

---

[8] The PAC is confusing and unclear at times as to which claims Caramore brings in her individual capacity, as opposed to her official capacity as a Board member.  The Court infers, and proceeds on the basis, that she is bringing her overbreadth claim—the First Cause of Action—in her individual capacity, because Judge Brodie permitted her to replead that claim only in that capacity.  *See Dismissal Order*, 2025 WL 929710, at *35.  The Second Cause of Action is labeled as being brought in her individual capacity.  (Massapequa PAC at 28).  The Third Cause of Action, the political speech claim, is unlabeled, (*id.* at 36), but the other remaining claims are brought in her official capacity, and labeled as such, (*e.g.*, *id.* at 39).  Moreover, the political speech claim is also brought by the Board, and it would make no sense to have Caramore also bring the same claim in her official capacity.  *See infra* p. 15 n.9.  So, it is interpreted as being brought in her individual capacity.

(but in her official capacity as a member of the Board).[9]  The rest of the claims dismissed in Judge Brodie's Order—the vagueness, separation-of-powers, and other state administrative law claims—do not reappear in the PAC.

III.    The NAGA Agreement and Lawsuit

On May 15, 2025, Massapequa executed an agreement with NAGA (the "Agreement").  (Massapequa PAC ¶ 100.  Two weeks later, NAGA and David Finkenbinder, (collectively, the "NAGA Plaintiffs") brought suit against the New York State Board of Regents and its members in their official capacity.  (*Native Am. Guardian's Assoc. v. N.Y. State Bd. of Regents* ("*NAGA*"), No. 25-CV-3008, Compl. filed May 29, 2025 ("NAGA Compl."), Dkt. No. 1).

NAGA is a non-profit organization founded in 2017 and incorporated and headquartered in North Dakota.  (*Id.* ¶ 7).  The organization's mission is to "increase the public awareness and education about Native American history and culture in public institutions, and to promote the respectful use of Native America names and imagery in public discourse."  (*Id.*).  NAGA asserts it is bringing this action on behalf of itself and its members, who include Native American students, parents, educators, community leaders, and non-Native individuals who share the organization's goals, whom NAGA

---

[9] Unless otherwise noted, when the Court uses the specific term "Massapequa and the Board," it is referring to the District, its Board, and Caramore in her official capacity, because a suit by Caramore in her official capacity is coextensive with any suit brought by the Board.  *See Kearns v. Cuomo*, 981 F.3d 200, 212 (2d Cir. 2020) (analyzing standing for suit brought by County Clerk in official capacity through injury to the Clerk's Office); *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 141–48 (2d Cir. 2021) (analyzing Department of Financial Services's standing in suit brought by Superintendent).  Caramore never alleges that she has the consent or authorization from the Board to bring suit on their behalf.

15

claims are "directly impacted by the enforcement of Part 123." (*Id.* ¶¶ 8, 11).  No member of the organization is identified other than NAGA's co-plaintiff, Finkenbinder, who is a Board Member of NAGA, an enrolled tribal member of the Crow Creek Sioux Tribe in South Dakota, and a current resident of West Coxsackie, New York.  (*Id.* ¶ 18).  Though NAGA submitted with its briefs affidavits by two other individuals affiliated with the organization, no employee, NAGA Board member, or student affiliated with Massapequa is identified by name in its complaint, nor does NAGA allege, even in conclusory fashion, any member's direct connection to the District, its Board, or Part 123.

Central to NAGA's Complaint, and also relevant to the *Massapequa* case, is the Agreement that NAGA and Massapequa executed on May 15, 2025.  (*Id.* ¶ 13).  The Agreement, which is attached as the sole exhibit to the NAGA Complaint, provides that:

> So long as the District continues its current educational programming and instruction concerning Native American history and culture as outlined in the attached Exhibit "A" and the obligations outlined in this Agreement, NAGA and the Board of Directors of NAGA fully permit, consent to, support, and authorize the District in its continued use of the District's Indigenous NIL for all school-related purposes, including but not limited to educational uses, athletic uses, community uses, and in any new programs hereafter developed.  The District shall meet with a NAGA representative, either in person or remotely, at least once per year to review and discuss the educational programming and instruction.  In exchange for NAGA's and the Board of Directors' permission, consent, support, and authorization of the District's use of the Indigenous NIL, the District also commits that it will continue to use the "Chiefs" name and logo as the District's official name and logo for all school-related purposes, including but not limited to educational uses, athletic uses, community uses, and in any new programs hereafter developed.  In the event that the District discontinues all the educational programing outlined in the attached Exhibit "A" or fails to continue using the "Chiefs" name, mascot, and logo,

> NAGA's and the Board of Directors' permission, consent, support, and authorization for the District's continued use of its Indigenous NIL rights will automatically be withdrawn by operation of this Agreement.  In such an event, NAGA and the Board of Directors of NAGA will have no cause of action of any kind and nature to compel or require the District to provide any kind of educational programing or instruction.

(*NAGA*, Mem. of Agreement dated May 15, 2025 ("NAGA Agreement"), attached to NAGA Compl. as Ex. A, Dkt. No. 1-1 ¶ 1).  The other provisions generally allege the exchange of "good, valid, and sufficient Consideration," (*id.* ¶ 2), expressly permit either party to "terminat[e] this Agreement upon 30 days written notice to the other," (*id.* ¶ 3), and allow for severance of the Agreement if any part is held invalid, though if the paragraph above is held invalid, either party "may at their option cancel this Agreement," (*id.* ¶ 5).  There is also a New York choice-of-law provision.  (*Id.* ¶ 6).  The Agreement is signed by NAGA co-founder Eunice Davidson (one of the aforementioned affiants), NAGA Board Member Crystal Tso, Massapequa District Superintendent Dr. William Brennan, and Board President Kerry Wachter, and Vice President Caramore.  (*Id.* at 3–4).  The NAGA Plaintiffs assert in briefing that Finkenbinder is a party to the contract because he is a NAGA Board member, (*e.g.*, *NAGA*, Pls.' Opp'n to Mot. to Dismiss & Reply in Supp. of Prelim. Inj. dated Sep. 4, 2025 ("NAGA Pls.' Opp'n"), Dkt. No. 25 at 6), and the NAGA Board of Directors itself is a party to the Agreement, however Finkenbinder sues here as an individual, not in his capacity as a NAGA Board member, (NAGA Compl. ¶ 19).  Finally, the exhibit referenced in the Agreement outlines a general plan for lessons focused on Native American history and culture by grade level.  (NAGA Agreement at 5).

The Agreement and NAGA's Complaint do not assert that NAGA has any actual rights to the Chiefs mascot.  They do not, for example, allege that NAGA created the mascot, owns or possesses any rights to it, or even that NAGA has the ability or right to license it.  Indeed, NAGA's Complaint suggests that "Chiefs" has been a mascot throughout Massapequa for decades—used by the Chamber of Commerce and the Fire Department, among others—suggesting it long ago passed into the public domain, with no one claiming rights to it.  (NAGA Compl. ¶¶ 72–75).

The NAGA Plaintiffs allege that the "Agreement requires that the Massapequa School District continue to use its moniker 'the Chiefs,'" and that in return, "the leaders of NAGA are committed to providing instruction to students regarding the Native American history and culture."  (*Id.* ¶¶ 14–15).  They contend that "[a]s applied, Part 123 nullifies the existing NAGA-MSD Agreement."  (*Id.* ¶ 166).  Massapequa and the Board likewise claim that they are unable to comply with both the Agreement and the requirements of Part 123.  (Massapequa PAC ¶ 111).  If forced to comply with Part 123, they allege they will incur substantial costs of replacing the Chiefs mascot, the erosion of community identity, and legal exposure for breaching the Agreement and for discrimination.  (*Id.* ¶ 114).

NAGA and Finkenbinder's Complaint is otherwise very similar to the *Massapequa* pleading.  The factual allegations are nearly identical to those in the Massapequa PAC with a few minor omissions or additions.  (*See* NAGA Compl. ¶ 53 n.2 (adopting the Massapequa Plaintiffs' Facts); *compare* Massapequa PAC ¶¶ 29–89, *with* NAGA Compl. ¶¶ 54–116).  For example, NAGA and Finkenbinder's Complaint

omits a few paragraphs specific to Massapequa's mission not relevant to NAGA, (Massapequa PAC ¶¶ 55–56), and the NAGA Complaint adds a footnote about the Kansas City Chiefs football team, (NAGA Compl. ¶ 78 n.3). NAGA's Complaint also adds facts about the complaint it filed with the U.S. Department of Education Office for Civil Rights ("OCR") against the Board of Regents for discrimination in implementing Part 123. (*Id.* ¶ 121). NAGA and Finkenbinder reported that OCR formally opened an investigation that was pending when their Complaint was filed. (*Id.* ¶¶ 122–23).

NAGA and Finkenbinder seek a declaratory judgment annulling Part 123 and an injunction against its enforcement. (*Id.* ¶ 3). Their Complaint includes five counts (some of which contain multiple causes of action), alleging that Part 123: (1) violates the Fourteenth Amendment Equal Protection Clause in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1981, and Article I, § 11 of the New York Constitution, (NAGA Compl. ¶¶ 125–38); (2) deprives NAGA and Finkenbinder of free speech rights under the First Amendment in violation of 42 U.S.C. § 1983, and under Article I, § 8 of the New York Constitution, (*id.* ¶¶ 139–50); (3) is unconstitutionally vague and an improper delegation under the Fourteenth Amendment's Due Process clause in violation of 42 U.S.C. § 1983, (*id.* ¶¶ 151–57); (4) violates the dormant Commerce Clause and the Indian Commerce Clause, (*id.* ¶¶ 158–68); and (5) violates Title VI of the Civil Rights Act of 1964, (*id.* ¶¶ 169–74).

NAGA and Finkenbinder moved for a preliminary injunction on July 7, 2025 to preserve the Agreement, which they alleged was subject to invalidation by Part 123.[10] (*NAGA*, Pls.' Mot. for Prelim. Inj. ("NAGA Pls.' First PI Mot."), Dkt. No. 16 at 11). Shortly thereafter, the Court required the parties to brief several questions related to the law-of-the-case doctrine and case management practices.  (*NAGA*, Order dated July 9, 2025, Dkt. No. 17 at 2).  When that briefing was complete, the Court directed the parties to submit a proposed briefing schedule for the motion for a preliminary injunction and any motion to dismiss from the Defendants.  (*NAGA*, Order dated July 28, 2025). NAGA and Finkenbinder filed an amended motion for a preliminary injunction on August 8, 2025, (*NAGA*, Pls.' Am. Mot. for Prelim. Inj. ("NAGA Pls.' Am. PI Mot."), Dkt. No. 21), and full briefing on the injunction and Defendants' motion to dismiss was completed thereafter.

<u>DISCUSSION</u>

I.    <u>The Massapequa Plaintiffs' Motion to Amend</u>

The Court first turns to the Massapequa Plaintiffs' motion to amend and file the PAC as the operative pleading.  After the period to amend as of right has passed, motions to amend pleadings are governed by two standards.  The first, a "liberal" and

---

[10] None of the Massapequa or NAGA Plaintiffs point to any enforcement of Part 123 against them.  The latest update brought to the Court's attention is that the SED denied Massapequa's request for an extension of the compliance deadline on June 20, 2025.  (*NAGA*, Pls.' Am. Mot. for Prelim. Inj. dated Aug. 8, 2025 ("NAGA Pls.' Am. PI Mot."), Dkt. No. 21-1 at 6).  NAGA does claim that Part 123 "has already been . . . compelling districts like Connetquot to eliminate Native symbols."  (NAGA Pls.' Opp'n" at 12).  There is, however, no indication of enforcement with respect to Massapequa—the only District relevant in this case—and no citation or evidence to support the claim that Part 123 has been used to void the Agreement.

"permissive" standard, *Sacerdote v. New York Univ.*, 9 F.4th 95, 115 (2d Cir. 2021), directs courts to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  The second permits motions to amend only upon a showing of "good cause."  *Id.* R. 16(b)(4). "The [Rule 15] period of 'liberal' amendment ends if the district court issues a scheduling order setting a date after which no amendment will be permitted." *Sacerdote*, 9 F.4th at 115.  If the court issues a Rule 16 order that explicitly "state[s] that no amendment will be permitted" after a date certain, the moving party must demonstrate good cause for permitting the amendment.  *Id.* at 115–16.

If, however, the district court's Rule 16 order does not set a date after which motions to amend are not permitted (for example, by simply setting a deadline for amended pleadings to be filed), there is no order "trigger[ing] the stricter Rule 16(b)(4) 'good cause' standard."  *Id.* at 115.  And therefore, any motions are governed solely by the more liberal Rule 15 standard.

The Rule 16 Scheduling Order in this case stated that "[a]ny future motions to amend the pleadings on or after 3/30/2024 will be denied absent a showing of good cause."  (*Massapequa*, Min. Entry dated Jan. 22, 2024, Dkt. No. 25); *cf. Sacerdote*, 9 F.4th at 116 ("District courts wishing to evaluate motions for leave to amend under Rule 16 after a particular date need only write their scheduling orders consistent with that intent, and state that no amendment will be permitted after that date in order to trigger the Rule 16 standard.").  However, the Court's subsequent Dismissal Order contemplated further amendment.  *Dismissal Order*, 2025 WL 929710, at *35.  That Dismissal Order, directing Plaintiffs to file an amended complaint within 30 days, superseded the prior Rule 16

order in the case and set a new deadline.  *See Sacerdote*, 9 F.4th at 115–16.  Plaintiffs were granted two extensions to file their Amended Complaint.  (*Massapequa*, Order dated Apr. 25, 2025; *Massapequa*, Order dated May 8, 2025).  Thus, though the motion to amend was not filed until May 19, 2025, the Court considers it submitted within the deadline for amendment.

Accordingly, the Court considers the Massapequa Plaintiffs' motion under the more liberal Rule 15 standard, which provides that leave to amend should be "freely give[n]."  Fed. R. Civ. P. 15(a)(2).  Under that Rule, "the only 'grounds on which denial of leave to amend has long been held proper' are upon a showing of 'undue delay, bad faith, dilatory motive, [or] futility.'"  *Sacerdote*, 9 F.4th at 115 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015)).  Delay, bad faith, and futility are addressed in turn below.

A.    Delay and Bad Faith

Defendants contend that the Massapequa PAC will prejudice them because of the "late stage of the litigation," the timing of Part 123's effective date, and the inclusion of new and surprising facts and causes of action.  (*Massapequa*, Defs.' Mem. in Opp'n to Mot. for Leave to Amend Compl. filed June 27, 2025 ("Massapequa Defs.' Opp'n"), Dkt. No. 72 at 5–8).  But the Massapequa Plaintiffs moved to amend their complaint less than two months after the Dismissal Order, which expressly contemplated amendment, and within four days of the emergence of new facts—namely, the execution of the Agreement.  Thus, while true that Part 123's effective date has been known to the

Massapequa Plaintiffs for years, Defendants have not explained, and the Court does not see, how they are prejudiced.

While some additional discovery may be required to address new issues, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *U.S. ex rel. Mar. Admin. v. Cont'l Ill. Nat. Bank & Tr. Co. of Chicago*, 889 F.2d 1248, 1255 (2d Cir. 1989).  And beyond being a "complete surprise," (Massapequa Defs.' Opp'n at 8), Defendants have not explained how the addition of new claims, based on new facts that did not exist earlier, would prejudice them with unusual discovery burdens.

And the only caselaw Defendants provide supporting that argument is inapposite.  (Massapequa Defs.' Opp'n at 6–7 (citing *Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 267 (2d Cir. 2009) (plaintiffs waited until the eve of summary judgment practice to move to amend and could not meet a Rule 16 standard); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 201 (2d Cir. 2007) (plaintiffs moved to amend more than seven months after becoming aware of the need to do so); *Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003) (plaintiffs moved to amend based on a state court decision issued over a year prior))).  Accordingly, the Court finds no bad faith or prejudice that precludes amendment.

B.    Futility

Although the Court may "decline to engage in a detailed futility analysis where the Court finds that these arguments are better suited for consideration in the context of a motion to dismiss," *Env't Sols. Assocs. Grp., LLC v. Conopoco, Inc.*, No. 20-CV-10699,

2021 WL 2075586, at *2 (S.D.N.Y. May 24, 2021), the Court exercises its discretion to conduct such analysis here in light of the parties' extensive briefing in the Massapequa cases and the related case brought by NAGA and Finkenbinder.

A "motion to amend will be considered futile if the Court determines, 'as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.'" *Charlot v. Ecolab, Inc.*, 97 F. Supp. 3d 40, 61 (E.D.N.Y. 2015) (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)) (adopting report and recommendation); *see also, e.g.*, *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 260 (2d Cir. 2002) (reversing the district court's order granting plaintiff leave to amend complaint where his proposed new claim "[wa]s barred by substantive contract law").[11]

"The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of . . . claims for relief." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018) (citing *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)). In deciding such a motion, the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quotations and alteration omitted); *Amadei*, 348 F. Supp. 3d at 155 ("[W]hen reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all

---

[11] On a motion to amend—which employs the same standard to evaluate futility as a motion to dismiss, *Charlot*, 97 F. Supp. 3d at 61—a court may consider any document "incorporated in the complaint by reference," "integral to the complaint," or subject to "judicial notice." *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (quotations omitted).

allegations of fact in the complaint and draw all reasonable inferences in favor of [the non-moving party].").

"To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (quotations omitted). In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations omitted). The determination of whether a party has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

This pleading requirement "does not impose a probability standard at the motion-to-dismiss stage." *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, -- F.4th --, 2025 WL 2921807 at *4 (2d Cir. Oct. 15, 2025) (noting that plausibility does not equate to probability). And "on a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives. Assuming that [plaintiff] can adduce sufficient evidence to support its factual

allegations, the choice between or among plausible interpretations of the evidence will be a task for the factfinder." *Id.* (quotations omitted).

Since the futility analysis for a motion to amend is the same as the standard for motions to dismiss, and because of the substantial overlap in the legal claims asserted, the Court analyzes the motion to amend in *Massapequa* and the motion to dismiss in the *NAGA* case together.

II.    Massapequa and the Board's Capacity to Sue

A threshold issue—capacity to sue—derails some of Massapequa and the Board's claims at the outset.

"Capacity has been defined as a party's personal right to come into court . . . capacity is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate and typically is determined *without regard to the particular claim* or defense being asserted." 6A Charles Alan Wright & Arthur R. Miller et al., Fed. Prac. & Proc. Civ. § 1559 (3d ed. 2025) (emphasis added).  It is bedrock, established New York law that "'municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation.'" *Dismissal Order*, 2025 WL 929710, at *8 (collecting cases) (quoting *City of New York v. State of New York*, 86 N.Y.2d 286, 289 (1995)).  "Constitutionally as well as a matter of historical fact, municipal corporate bodies—counties, towns and school districts [like Massapequa]—are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as its agents." *City of New York*, 86 N.Y.2d at 289–90.  Massapequa and the Board exist

because they were created by New York State itself. They both are a "creature of the state," *City of Trenton v. State of New Jersey*, 262 U.S. 182, 187 (1923), and so for either to sue New York State (or its arm, the Board of Regents) is akin to a party suing itself. *See Dismissal Order*, 2025 WL 929710, at *8 ("Municipal entities . . . 'cannot have the right to contest the actions of their principal or creator affecting them in their governmental capacity or as representatives of their inhabitants.'" (quoting *City of New York*, 86 N.Y.2d at 289–90)). Perhaps in recognition of this, Caramore has now dropped several of her official capacity claims from her first lawsuit. As a municipal official, she cannot sue the State of New York or a state subdivision, like the Board of Regents, in her official capacity. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 63 (2d Cir. 2017) ("[M]unicipalities and other local governmental corporate entities *and their officers* lack capacity to mount constitutional challenges to acts of the State." (emphasis added) (quotation omitted)). And Massapequa has dropped its Fourteenth Amendment claim, which Judge Brodie found could not be asserted, because it could not sue the State for violations of the Fourteenth Amendment. *Dismissal Order*, 2025 WL 929710, at *8–*9. Those same principles require dismissal of several of Massapequa and the Board's other claims now.

There are recognized exceptions to this capacity rule, including, as relevant to this case, the proscription exception: "where the public corporation asserts that, if it is obliged to comply with the statute, that very compliance will force the corporation to violate a constitutional proscription." *Id.* at *8 (quoting *In re World Trade Ctr.*, 846 F.3d

at 63–64).[12]  For example, Massapequa and the Board, if obligated to comply with Part 123, could potentially be forced to then violate the First Amendment rights of school employees or officials.  Massapequa and the Board failed to allege that this exception applied to them in the first round of this case.  *Id.* at *9.

The other exception relevant here, distinct from the four enumerated by the New York Court of Appeals, arises from the Supremacy Clause.  "[A] subdivision may sue its state under the Supremacy Clause."[13]  *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019); *see also Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628–29 (10th Cir. 1998) (explaining that municipalities may not sue their creating state under provisions protecting individual rights, but could assert structural challenges under the Supremacy Clause).  In *Tong*, the Second Circuit explained that "[t]he view that subdivisions were broadly prevented from suing a state was put to rest" in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).  930 F.3d at 72.  "If the Supremacy Clause means anything, it means that a state is not free to enforce within its boundaries laws preempted by federal law.  Lawsuits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur."  *Id.* at 73.  In Sections A and B below, the Court

_____

[12] The other exceptions are: "(1) where a public corporation has express statutory authorization to bring suit; (2) where the legislation adversely affects a public corporation's proprietary interest in a specific fund of moneys; [and] (3) where the statute impinges upon 'Home Rule' powers of a public corporation constitutionally guaranteed under article IX of the New York State Constitution."  *In re World Trade Ctr.*, 846 F.3d at 63.

[13] *Tong*, however, did not disturb prior Second Circuit caselaw that a municipal entity may not sue its state to vindicate its own rights under the Fourteenth Amendment.  930 F.3d at 73 n.7 (citing *Aguayo v. Richardson*, 473 F.2d 1090, 1100 (2d Cir. 1973); *City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973)).

discusses Massapequa's capacity to bring its renewed First Amendment claims, and then the six new federal claims brought for the first time in the Massapequa PAC.

    A.    <u>First Amendment Claims</u>

    The Massapequa PAC contains no new allegation in its overbreadth claim that Massapequa or its Board will be forced to violate the rights of its employees or officials—it alleges only, in general terms, that free expression is chilled by Part 123. (*See* Massapequa PAC ¶ 121.)  In their briefing, they claim that they have now pled prescription.  (*Massapequa*, Pls.' Reply in Supp. of Mot. for Leave to file Second Am. Compl. filed July 7, 2025 ("Massapequa Pls.' Reply"), Dkt. No. 75 at 6 (identifying ¶¶ 72–73, 90, 117, & 121–24)).  Hardly.  Those paragraphs are identical to the allegations in the prior Amended Complaint that the Court found lacking.  (*Compare* Massapequa Am. Compl. ¶¶ 70–71, 89, *with* Massapequa PAC ¶¶ 72–73, 90 (containing identical descriptions of what Part 123 requires the District and Board to do)).  The conclusion that those allegations are insufficient is law of the case and governs here.  *Dismissal Order*, 2025 WL 929710, at *9 ("The Court finds that School District Plaintiffs and School Board Plaintiffs also lack capacity to sue for violations of the First Amendment because they have not alleged that, if obliged to comply with Part 123, they would violate the constitutional rights of school officials and employees."); *In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) ("The law of the case doctrine, although not binding, 'counsels a court against revisiting its prior rulings in subsequent stages of the same case absent "cogent" and "compelling" reasons,' including . . . 'the need to correct a clear error or prevent

manifest injustice.'" (quoting *Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cir. 2008))); *see also Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817 (1988).

What the PAC does add—more detailed allegations of how Part 123 sweeps too broadly (Massapequa PAC ¶¶ 90, 117, 121–24)—are not facts or information about Massapequa or the Board's alleged part in violating the rights of its employees or officials.  There are two conclusory references to Massapequa's employees and officials. These references are identical to what was in the prior complaint, noting that the District has 650 employees and Part 123 prevents them (and any future employees) from wearing Chiefs apparel on school property.  (*Id.* ¶¶ 120–21).  These references are not allegations that Massapequa and the Board will be forced to police and restrict the speech of their employees, but rather that Part 123 infringes their employees' rights *directly*.  Such allegations fail to set forth a proscription exception to the capacity to sue. *See, e.g., Blakeman v. James*, No. 24-CV-1655, 2024 WL 3201671, at *14 (E.D.N.Y. Apr. 4, 2024) (finding proscription not plead where "County Plaintiffs broadly argue that rescission of the Executive Order would . . . 'violat[e] the constitutional rights of women as a protected class.'").

The same is true for Massapequa and the Board's other First Amendment claim based on political speech.  They assert that Part 123 violates the First Amendment rights of incumbent Board members and District employees or officers that run for the Board. (Massapequa PAC ¶ 169).  The political speech of incumbent Board candidates (or other District employees running for a Board position) is allegedly restricted because Part 123

30

prohibits them from using any Indigenous mascot on their apparel or campaign materials when on school grounds or at school functions. (*Id.* ¶¶ 170–72).

The political speech claim lacks a single allegation as to how Massapequa and the Board will be forced to participate in the violation of the political speech rights of the candidates for Board positions. Though Plaintiffs do make new allegations about proscription in reply, "Plaintiffs cannot amend their Complaint through their motion papers." *Dismissal Order*, 2025 WL 929710, at *27 n.25 (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)). In any event, the brief only points either to language identical to the Amended Complaint that was found insufficient, (*see* Massapequa PAC ¶¶ 72, 73), or new language that alleges the unconstitutionality of Part 123 devoid of any reference to Massapequa's and the Board's involvement in enforcement, (*see id.* ¶¶ 168–82).

It would have been easy enough to plead proscription for this claim: Part 123 requires public schools like Massapequa to prohibit its officers—like School Board members—from using Indigenous mascots on "school property" or "at a school function." 8 NYCRR § 123.5. Massapequa and the Board could have alleged that current Board members or school employees, whether as part of a Board election campaign or Board or community meeting, planned to use (or had in the past used) the Chiefs mascot as part of their political activities; and that Part 123 would require Massapequa and the Board to cease and silence them. Such basic factual allegations are missing from the PAC. And, thus, Massapequa and the Board lack the capacity to bring their First Amendment political speech claim against Defendants.

B.    Massapequa's New Claims: Title VI and VII, Section 1981, Dormant and Indian Commerce Clause, and Bill of Attainder

Massapequa and the Board's other constitutional claims for violations of the dormant Commerce Clause (Seventh Cause of Action), Indian Commerce Clause (Eighth Cause of Action), as well as the federal statutory claims for violation of Title VI (Fourth Cause of Action), Title VII (Fifth Cause of Action), and Section 1981 (Sixth Cause of Action) are asserted under the Supremacy Clause and, therefore, fall under the *Tong* exception.[14]  (*See* Massapequa PAC ¶¶ 212, 230, 244, 259, 274 (invoking the Supremacy Clause for its Title VI, Title VII, Section 1981, dormant Commerce Clause, and Indian Commerce Clause claims)).  And Defendants do not challenge these claims on capacity grounds.  The Bill of Attainder claim (Ninth Cause of Action) does not expressly invoke the Supremacy Clause, nor is it a claim that would fit within the proscription exception.  Still, Defendants do not contest Massapequa's capacity to bring the claim.  Thus, the Court concludes these claims are not barred by incapacity to sue.[15]

---

[14] *Tong*, which itself concerned preemption by a federal statute (the Federal Aviation Act), appears to make no distinction between statutory and constitutional claims, so long as the claim is brought under the Supremacy Clause.  930 F.3d at 73.

[15] Although the Court concludes that Massapequa and the Board lack the capacity to bring certain claims, this opinion still examines whether they have standing. It does so for two practical reasons.  First, although the Supreme Court and the Second Circuit have made clear that standing and capacity are separate inquiries, neither has stated which one must be analyzed first, but both have held that standing is a threshold subject-matter jurisdiction question that precedes any analysis of the merits.  *E.g., In re World Trade Ctr.*, 846 F.3d at 66 n.6 ("Indeed, the Court of Appeals has drawn a distinction elsewhere between 'standing' and 'capacity to sue,' stating that '[t]he issue of lack of capacity to sue does not go to the jurisdiction of the court, as is the case when the plaintiffs lack standing.'" (quoting *City of New York*, 631 N.Y.S.2d at 652)).  Second, Defendants, while identifying the capacity-to-sue argument in the context of First Amendment claims, fail to raise it in response to the other claims.

III.    <u>Eleventh Amendment Immunity</u>

Though the Massapequa Plaintiffs dropped the New York State Board of Regents from their suit and now only name its members as defendants, the NAGA Plaintiffs elected to name both the Board of Regents and its members as defendants.  (NAGA Compl. ¶ 20).  Unfortunately, neither NAGA nor Defendants elected to call the Court's attention to the obvious Eleventh Amendment sovereign immunity problems presented by such allegations.

The Eleventh Amendment generally bars suit *in federal court* "against a state or its agencies absent a waiver of immunity or congressional legislation specifically overriding immunity."  *Mamot v. Bd. of Regents*, 367 F. App'x 191, 192 (2d Cir. 2010); *see also Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100–01 (1984) (noting immunity extends to both damages and injunctive relief); *see* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit . . . commenced or prosecuted against one of the United States[.]").  Eleventh Amendment immunity also extends to "state officials sued in an official capacity."  *Bell v. Kaleida Health*, No. 25-0366, 2025 WL 2938354, at *2 (2d Cir. Oct. 16, 2025).

This immunity, though, is not inviolate.  States may waive their own immunity, or Congress may abrogate it pursuant to its Fourteenth Amendment power.  *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015).  The Supreme Court has also recognized, in *Ex parte Young*, "'a narrow exception' to Eleventh Amendment immunity 'that allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law.'"  *Unkechaug Indian*

33

*Nation v. Seggos*, 126 F.4th 822, 829 (2d Cir. 2025) (quoting *Silva v. Farrish*, 47 F.4th 78, 84 (2d Cir. 2022)), *cert. denied*, No. 24-1240, 2025 WL 2823807 (Oct. 6, 2025).  To determine whether a case falls within *Ex parte Young*, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* (quoting *W. Mohegan Tribe & Nation v. Orange Cnty.*, 395 F.3d 18, 21 (2d Cir. 2004)).

The "Board of Regents" is an "agenc[y] of the State of New York," and thus "entitled to immunity under the Eleventh Amendment." *Mamot*, 367 F. App'x at 192–93 (affirming dismissal of claims against Board of Regents).  Congress has abrogated states' Eleventh Amendment immunity for Title VI claims.  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); 42 U.S.C.A. § 2000d-7.  However, as for the remainder of NAGA's claims, they identify no source of waiver by New York, and the Court is not aware of one.  *See Doe v. State Univ. of New York Purchase Coll.*, 617 F. Supp. 3d 195, 211 (S.D.N.Y. 2022) ("New York has not prospectively waived its immunity for claims brought pursuant to the New York State Constitution.").  And it is well-established that Congress did not abrogate states' sovereign immunity for § 1983 claims, *Mallet v. New York State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 138 (2d Cir. 2025), and New York "has not consented to § 1983 suits in federal court," *Mamot*, 367 F. App'x at 192.  Accordingly, except for NAGA's Title VI claim, the Board of Regents is entitled to Eleventh Amendment immunity and the claims against it are dismissed for lack of subject matter jurisdiction.

Still, there remain all of the parties' claims against the Board of Regents members themselves. Massapequa and NAGA almost entirely allege ongoing violations of federal law by individual Board of Regents members in their official capacity, and they seek prospective injunctive relief. Accordingly, the *Ex parte Young* exception applies to their federal claims against these Board of Regents members.

However, NAGA also brings claims under the New York State Constitution for free speech and equal protection violations. These claims do not fit within the *Ex parte Young* exception, and thus the Court must dismiss them. *Pennhurst*, 465 U.S. at 106 ("We conclude that *Young* . . . [is] inapplicable in a suit against state officials on the basis of state law."); *e.g.*, *Harvey v. Corneal*, No. 24-CV-7380, 2025 WL 2345879, at *3 (S.D.N.Y. Aug. 13, 2025) ("New York has waived its sovereign immunity from suit on state law claims, but only insofar as suit is brought in the New York Court of Claims. . . . State law claims brought against public employees in their official capacities in federal court are therefore routinely dismissed for lack of subject matter jurisdiction." (citations omitted)) (collecting cases).

In summary, Massapequa's claims proceed past the Eleventh Amendment sovereign immunity bar, since they seek prospective relief against state officials, in their official capacity, for violations of federal law. And NAGA may proceed with its federal causes of actions against those same individual Board of Regents members. These claims fall within *Ex parte Young*.

NAGA cannot, however, proceed with its claims against the New York State Board of Regents itself, save its Title VI claim, which is subject to a congressional waiver

of immunity.  Nor can NAGA bring its state law claims, since they do not meet any of the exceptions enumerated above.

IV.    <u>Article III Standing</u>

"[A] district court must generally resolve material factual disputes and establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits."  *All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006).  "Article III limits federal judicial power to 'Cases' and 'Controversies,' and standing to sue 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'"  *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 92 (2d Cir. 2019) (citation omitted) (quoting *Spokeo, Inc., v. Robins*, 578 U.S. 330, 338 (2016)).  "The 'case or controversy' requirement is 'fundamental to the judiciary's proper role in our system of government.'"  *Murthy v. Missouri*, 603 U.S. 43, 56 (2024) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).  "[I]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."  *Id.* at 57 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).

A case or controversy "exists only when at least one plaintiff" has standing to sue.  *Id.*  The standing requirement "help[s] ensure that the plaintiff has such a personal stake in the outcome of the controversy as to warrant her invocation of federal-court jurisdiction."  *Id.* (quotations omitted).  To establish standing, a plaintiff "must show that she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable

ruling.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Because "standing is not dispensed in gross," a plaintiff "must demonstrate standing for each claim that they press" against each defendant "and for each form of relief that they seek." *Id.* at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

"[W]hile a party may seek redress for injuries done to that party, it may not for 'injuries done to others.'" *Rynasko v. New York Univ.*, 63 F.4th 186, 193 (2d Cir. 2023) (quoting *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972)). So the "'irreducible' requirements of Article III" standing—injury, traceability, and redressability—"apply to . . . organizational plaintiffs alike." *Doe v. Hochul*, 139 F.4th 165, 182 (2d Cir. 2025).

"[W]here the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quotations omitted). If it chooses the latter route, the association must "demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Italian-Am. Def. League v. City of New Haven*, No. 24-2877, 2025 WL 2731290, at *1 (2d Cir. Sep. 25, 2025) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The NAGA Plaintiffs seek a preliminary injunction. In such a situation, "[t]he evidentiary burden for establishing Article III standing . . . is at least as onerous as the

burden for establishing standing to secure a summary judgment." *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 113–14 (2d Cir. 2025).  But Defendants seek dismissal, while the Massapequa Plaintiffs' motion to amend is judged like a motion to dismiss, and the "[t]he burden for establishing standing at the dismissal stage is lower." *Id.* at 114.  Under that standard, "general factual allegations of injury resulting from the defendant's conduct may suffice," and a court is to "presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* at 119 (quotations omitted).  The Court has reached its standing conclusions based on the NAGA Plaintiffs' failure to meet the lower, motion to dismiss standard.[16]

In Section A below, the Court first analyzes the First Amendment claims and concludes Massapequa and its Board (including Caramore in her official capacity), as well as all of the NAGA Plaintiffs, do not have standing to bring their First Amendment claims.  But Caramore's overbreadth, free speech, and political speech causes of action brought in her individual capacity may go forward.  Then, in Sections B and C, the Court finds that the NAGA Plaintiffs do not have standing to bring their equal protection and due process challenges.  The Court then holds that none of the parties have standing to bring their dormant and Indian Commerce Clause claims in Sections D and E.  The parties' Title VI claims and Massapequa's Title VII claim, and the lack of

---

[16] Where a plaintiff fails establish standing for a preliminary injunction, the Court must determine whether the failure "arises from the insufficiency of the plaintiff's *evidence* of standing," which "may be remediable," in which case dismissal of the entire action "would be premature." *Do No Harm*, 126 F.4th at 121.  The appropriate "consequence of that failure is that *the plaintiff isn't entitled to a preliminary injunction*." *Id.* at 122.  These nuances are not triggered here, where the Court evaluates standing against the dismissal standard, not a heightened preliminary injunction standard.

standing to bring them, is addressed in Section F.  In Section G, the Court finds that parties in both cases lack standing to bring a Section 1981 claim.  Massapequa and the Board's Bill of Attainder claim is dismissed on the merits in Section V.

A.    First Amendment Claims

For pre-enforcement First Amendment challenges, "somewhat relaxed standing . . . rules" apply.  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013).  A plaintiff must demonstrate only (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest;" (2) "that the intended conduct is 'arguably prescribed by' the challenged regulation"; and (3) "that 'there exists a credible threat of prosecution thereunder' that is 'sufficiently imminent.'"  *Upsolve, Inc. v. James*, 155 F.4th 133, 139 (2d Cir. 2025) (quoting *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 159, 162 (2014)).

1.    Massapequa and the Board

Neither Massapequa or the Board has suffered, or is likely to suffer, a cognizable First Amendment injury as a result of Part 123.  Analyzing this question is not helped by either side's briefing, and requires some parsing and interpretation of the PAC.  Massapequa and the Board first try to invoke the overbreadth exception to standing, claiming that they can raise a First Amendment overbreadth challenge to the broad, impermissible sweep of Part 123.  (Massapequa PAC ¶ 120 ("Under the third-party standing exception, this case is not just about Plaintiff Caramore's right to engage in First Amendment expressive activity, or her fellow Board members' ability to do so.")).  But they misapprehend overbreadth doctrine.  The third-party bar to standing is an

exception to the prudential—not Article III—limits on standing, which is in addition to the requirements of injury, causation, and redressability.

"Overbreadth challenges are a form of First Amendment challenge and an exception to the general rule against third-party standing. A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) (citation omitted); *see also United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019) ("Under the overbreadth doctrine, 'the prudential limitations against third party standing are relaxed, and the litigant may assert the rights of individuals whose interests might be affected by the statute but who are not before the court.'" (citation omitted)). But raising an overbreadth challenge does not absolve the plaintiff from meeting the constitutional "injury-in-fact" requirement. *See id.* ("Accordingly, [the plaintiff] may challenge the [federal laws] as unconstitutionally overbroad only if *he* can establish Article III standing." (emphasis added)); *Farrell*, 449 F.3d at 499 ("We allow a party to bring an overbreadth challenge where that party satisfies the [Article III] requirement of injury-in-fact, and [where] it can be expected satisfactorily to frame the issues in the case." (quotations omitted)); *Hedges v. Obama*, 724 F.3d 170, 204 (2d Cir. 2013) ("Plaintiffs repeatedly refer to the First Amendment overbreadth doctrine as if it were relevant to whether they have established Article III standing. It is not. . . . [T]he overbreadth doctrine speaks to whose interests a plaintiff suffering Article III injury may represent. It does not provide

a reason to find such injury where none is present or imminently threatened in the first instance.").

The injury need not be even a free speech injury—any legally cognizable injury will suffice. *See United States v. Sineneng-Smith*, 590 U.S. 371, 389–90 (2020) (Thomas, J., concurring) ("Overbreadth doctrine . . . allows a litigant without a legal injury to assert the First Amendment rights of hypothetical third parties, so long as he has personally suffered a real-world injury." (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973))); *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[T]he plaintiff still must allege a distinct and palpable injury to himself . . . to seek relief on the basis of the legal rights and interest of others[.]"). "An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Here is where Massapequa and the Board's presentation falls short. Outside of using a series of First Amendment and constitutional buzzwords, they do little to identify any injury suffered as a result of Part 123. Their briefing identifies five alleged "direct injuries," from Part 123: the regulation "compels Plaintiffs to restrict protected speech, imposes compliance costs, chills the democratic process, creates risk of legal exposure for constitutional violations, and erodes longstanding cultural identity tied to the 'Chiefs' name." (Massapequa Pls.' Reply at 7). No further elaboration is provided. Indeed, the overbreadth claim in the PAC contains no reference to these injuries. (*See* Massapequa PAC ¶¶ 116–26). In any event, they are not cognizable.

The claim that Massapequa and the Board are being forced to chill the speech of others,[17] presumably referring to Part 123.5, which requires a district to stop employees and officers from using Indigenous mascots on school property or any school function, has a number of problems.

First, as an arm of the government, and a sub-entity of a state, it may not have any First Amendment rights whatsoever, meaning it cannot use a First Amendment injury to bring an overbreadth claim. This is not a capacity-to-sue problem, but a question of whether the government itself has First Amendment rights and could ever suffer a First Amendment injury. *See Dismissal Order*, 2025 WL 929710, at *9 n.15 (collecting cases); *e.g.*, *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 206 (2014) ("The First Amendment does not protect the government[.]"); *see also Creek v. Vill. of Westhaven*, 80 F.3d 186, 192 (7th Cir. 1996) ("Only a few cases address the question whether municipalities or other state subdivisions or agencies have any First Amendment rights. All but one, and that not a case against a municipality, answer 'no.'") (collecting cases); *but see* David Fagundes, State Actors as First Amendment Speakers, 100 Nw. U. L. Rev. 1637, 1639 (2006) ("Courts have varied in their receptivity to the notion that the First Amendment may extend to government speech. The

---

[17] The Massapequa Plaintiffs once use the label "prior restraint," as Caramore does several times in her individual free speech claim. (Massapequa PAC ¶¶ 121, 131–32, 137). But they do not explain how Part 123 is one of "the two traditional types of prior restraint: (1) preventing the printed publication of disfavored information, and (2) a facially-neutral law that sets up an administrative apparatus with the power and discretion to weed out disfavored expression before it occurs." *Citizens United v. Schneiderman*, 882 F.3d 374, 386–87 (2d Cir. 2018) (citations omitted) ("The unequalled power of the presumption against prior restraint is best reserved for situations that closely resemble these two clear cases.").

majority of courts have reflexively rejected the notion, relying on the assumption that the First Amendment can only restrict, not protect, state actors.  A minority of courts, in contrast, have arrived at different conclusions."); *e.g.*, *Cnty. of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1387, 1390 (E.D.N.Y. 1989) (Weinstein, J.) ("A municipal corporation, like any corporation is protected under the First Amendment in the same manner as an individual."), *aff'd,* 907 F.2d 1295 (2d Cir. 1990); *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 599 (S.D.N.Y. 2010) (collecting both cases denying that government actors have First Amendment rights and those finding they have such protections, including the right to petition).  If municipalities lack First Amendment rights, neither Massapequa nor the Board can avoid being drafted by the State to chill or silence the speech of others.  That is not to say that the employees, officials, or students lack First Amendment rights—they plainly do have them and are free to challenge Part 123 on their own.  But neither Massapequa nor the Board can claim any cognizable First Amendment injury, nor can they claim the potential future injury of their employees.

Second, even assuming that either Massapequa or the Board could invoke the First Amendment's protection, any injury from coercion is not actual or imminent, but instead conjectural or hypothetical.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To be sure, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 & n.5).  Here Massapequa and the Board allege (in briefing only) that they will be forced to prevent employees or

43

officers from using the Chiefs mascot at school events or on school property.

(Massapequa Pls.' Reply at 6–8).  While this might appear to be a First Amendment

coercion claim targeting the conduit of the employee's speech, *see Nat'l Rifle Ass'n of*

*Am. v. Vullo*, 144 F.4th 376, 385 (2d Cir. 2025) [hereinafter *NRA v. Vullo*], the allegations

in the PAC are too probabilistic and vague to infer that there is substantial risk the

injury will occur.[18]

 The Massapequa PAC refers to no employees or officials (other than Caramore)

who use the Chiefs mascot or intend to do so on school property or at a school event.  In

other words, there is no employee or official who Massapequa or the Board would

likely have to silence under Part 123.5.  Presumably, such a person exists or could have

been identified.  But the PAC only includes references to the use of the Chiefs mascot by

the town of Massapequa, (Massapequa PAC ¶¶ 45–51), and by community members at

school functions or around the town, (*id.* at ¶¶ 52–53).  Those references do not help,

since neither the Town nor the private citizens (or even students) are barred or

regulated in any way by Part 123.  They are free to use the Chiefs mascot and wear

Chiefs apparel as they currently do, and neither Massapequa nor the Board is required

to prevent them from doing so under the regulation.  While employees or officials need

_____

 [18] Crafting a coercion claim out of the facts in this case requires some contortion of the doctrine.  Coercion claims under the First Amendment exist when the government targets (1) the speaker itself; (2) a "conduit for the speaker (*i.e.*, a person who disseminates the speech for the speaker)"; or (3) "a third-party associate of the speaker (*i.e.*, a person with whom the speaker interacts or does business)."  *NRA v. Vullo*, 144 F.4th at 385.  When a school employee wears or uses the Chiefs mascot, it appears the employee—and not Massapequa or the Board—is who is targeted.  The only way for Massapequa to bring a coercion claim is to infer that it serves as the conduit for the employee's speech, because the speech occurs on school grounds.

not be identified by name, Massapequa and the Board must identify *some* person—or allege that there are employees or officials who use the Chiefs mascot on campus—if they want to use "coercion" as injury. *See Fac., Alumni, & Students Opposed to Racial Preferences v. New York Univ.*, 11 F.4th 68, 76 (2d Cir. 2021) [hereinafter *FASORP*] ("By way of identifying members who have suffered the requisite harm, FASORP only asserts that its membership includes 'faculty members or legal scholars who have submitted articles to the Law Review in the past, and who intend to continue submitting their scholarship to the Law Review in the future' and 'individuals who have sought and applied for entry-level or lateral teaching positions at the Law School and intend to do so again the future, or remain potential candidates . . . .' FASORP argues that '[i]t's hard to get more specific than that.' We do not agree. . . . For example: When did FASORP's members submit articles or apply for jobs at NYU? Have those members drafted articles they intend to submit? If so, when do they plan to submit?" (citations omitted)). But they have not. (As for Caramore's use of the Chiefs, neither Massapequa nor the Board allege that they intend to prevent her from using it. And it would be implausible if they did, since she is their co-plaintiff.) Simply put, "allegations of *possible* future injury are not sufficient," *Lacewell v. Office of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (quoting *Clapper*, 568 U.S. at 409), because they run contrary to the rule that injury not be speculative. *FDA*, 602 U.S. at 381; *see, e.g.*, *FASORP*, 11 F.4th at 76 ("FASORP effectively asks us to accept a 'self-description of the activities of its members' and to conclude that 'there is a statistical probability that some of those members are threatened with concrete injury.' Such allegations are plainly

insufficient to show that FASORP's members have suffered the requisite harm here."); *Liu v. Democratic Nat'l Comm.*, No. 21-CV-0767, 2021 WL 5351886, at *3 (S.D.N.Y. Nov. 15, 2021) ("Liu has not alleged an injury that is 'actual or imminent' as opposed to being 'conjectural or hypothetical'. . . . Whether Liu will suffer the injuries he fears thus will depend on the entirely speculative question regarding the rules that the DNC adopts[.]" (citation omitted)), *aff'd*, No. 21-3021, 2022 WL 4372587 (2d Cir. Sep. 22, 2022).

The other injuries identified by Massapequa and the Board fare no better.  As for the claimed "compliance costs," (Massapequa PAC ¶ 114), while it is true that "[m]onetary costs 'are of course an injury,'" *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2133 (2025) (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023)), such costs must have either been incurred already or be inevitable.  *Lacewell*, 999 F.3d at 147.  Otherwise, potential future costs are simply conjecture and "too speculative . . . to support standing." *Id.* at 143 n.14 ("DFS still has yet to incur these costs, . . . thus demonstrating that these costs—like the other costs DFS alleges it will incur—are too speculative at this stage to support standing.").  Other than the passing reference to "costs" of compliance, the Massapequa PAC makes no mention of what financial or other costs are imposed to comply with Part 123.  While in their briefs, Massapequa and the Board note that they would incur expenses to find a new mascot for the school, a school is not required to have a mascot, and there is no allegation that if forced to comply with Part 123, Massapequa would seek out a replacement.  It would have been easy enough to identify the mascot's presence on school property, from which one could infer some "cost" for removal, but the PAC only references the use of

the mascot by community members and throughout the town.  In any event, had they done so, the cost injury would still be speculative because Part 123 does not automatically require "removal" of the Chiefs mascot.  For instance, it exempts school buildings named after an Indigenous tribe and permits displays for purposes of "classroom instruction."  *See* 8 NYCRR §§ 123.1, 123.2.  The costs here are therefore neither inevitable nor have they been incurred, and thus they constitute only a vague and speculative injury.  *See, e.g.*, *Lacewell*, 999 F.3d at 143 n.14; *Maione v. McDonald*, No. 18-CV-7452, 2025 WL 2676591, at *7 (S.D.N.Y. Sep. 18, 2025) ("[T]hese conclusory allegations, which lack any details about their timing or circumstances, do not plausibly establish that there will be any future cost-sharing burdens."); *Obstfeld v. Unifin, Inc.*, 774 F. Supp. 3d 497, 503 (E.D.N.Y. 2025) ("[Plaintiff's] purported harms of incurring expenses to mitigate the risk of debt collection and emotional damage will not support constitutional standing.").

Massapequa and the Board then claim that they are injured because Part 123 "creates risk of legal exposure for constitutional violations," (Massapequa Pls.' Reply at 7; *see also* Massapequa PAC ¶ 114), a contention it never explains, but which presumably refers to its exposure for statutory violations: its claims under Title VI and VII.  But as noted below, *infra* p. 79, they have not established injury there either.

Finally, Massapequa and the Board refer to the injury from chilling of the "democratic process" and erosion of "longstanding cultural identity tied to the 'Chiefs' name."  (Massapequa Pls.' Reply at 7).  These alleged injuries, without more

explanation or detail, are so hollow as to border on the meaningless, and not concrete enough to constitute Article III injury.

The lower standard imposed for injury in pre-enforcement challenges, *supra* p. 39, does not save these injury theories. Even under a relaxed standard, the injury must be "sufficiently imminent." *Susan B. Anthony*, 573 U.S. at 159 ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" (citation omitted)). And though "imminence is concededly a somewhat elastic concept," it at minimum requires that any injury not be "speculative." *Clapper*, 568 U.S. at 409 (citation omitted). And as the foregoing discussion illustrates, the identified injuries—which have no detail supporting them in the PAC—are little more than speculation or conjecture.

Because neither Massapequa nor the Board has established any Article III injury, it cannot bring an overbreadth claim. *E.g.*, *Hedges*, 724 F.3d at 204–05; *Smith*, 945 F.3d at 736–38; *Brokamp v. James*, 66 F.4th 374, 389–90 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1095 (2024); *Liu v. New York City Campaign Fin. Bd.*, No. 14-CV-1687, 2016 WL 5719773, at *5 (S.D.N.Y. Sep. 29, 2016).

Their other First Amendment claim, alleging a free speech restriction on political speech, has a separate standing problem. Massapequa here sues on the basis of injury to its employees—their inability to use the Chiefs mascot when running for School Board—not any restriction on Massapequa's own political speech. (Massapequa Pls.'

48

Reply at 5 ("The new Third Cause of Action alleges that Part 123 imposes unconstitutional restrictions on the speech of incumbent board members and district employees[.]"); Massapequa PAC ¶ 172).  But that is a classic attempt to sue for the injuries of others, for which no exception is identified by Massapequa.  "[A] plaintiff will have standing only to 'assert his or her own legal rights and interests' and may not 'rest a claim to relief on the legal rights or interests' of others."  *Doe*, 139 F.4th at 177 (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)); *see, e.g., LaPierre ex rel. Town of Yorktown v. DiBartolo*, No. 12-CV-1996, 2013 WL 656313, at *4 (S.D.N.Y. Feb. 21, 2013) (dismissing plaintiffs' attempt to claim injuries on behalf of their town); *Worrell v. Cortines*, No. 90-CV-3142, 1995 WL 1079717, at *7 (E.D.N.Y. Mar. 26, 1995) (dismissing public school teacher's claims based on injury to her students).

The Board also claims that Part 123 infringes on its own rights by precluding its current, incumbent members from engaging in political expression, in the form of the Chiefs mascot, in connection with Board elections or school events.  (Massapequa Pls.' Reply at 5-6; Massapequa PAC ¶ 171).  The problem is the same as Massapequa's.  The Board qua the Board is not engaging in political speech, at least any identified in the Massapequa PAC.  The Board *itself* is not running for reelection or engaging in its own election-related political speech at school events.  Individual Board members seeking reelection, like Caramore, are engaged in that speech.  And just like Massapequa cannot sue to vindicate the First Amendment rights of its employees, the Board cannot do the same for its members.

2.     NAGA and Finkenbinder

NAGA and Finkenbinder also challenge Part 123 on First Amendment free speech grounds.  (NAGA Compl. ¶¶ 139–50).  They assert three forms of alleged injury.  *First*, they allege NAGA and Finkenbinder have standing because Part 123 nullifies the Agreement, to which NAGA and NAGA's Board (of which Finkenbinder is a member) are signatories.  (NAGA Pls.' Opp'n at 4–5).  *Second*, Finkenbinder asserts he has standing as a New York State taxpayer and as an individual because Part 123 bans his Native expression (such as his cultural regalia) on school property.  (*Id.* at 7).  And *third*, Finkenbinder's injury (as a member of NAGA and its Board) gives NAGA associational standing, as do the injuries of NAGA's other Native members "who are impacted by the Native Name Ban."  (*Id.* at 6–7).  None of these theories of injury satisfy Article III.

a.     The Agreement is Not a Contract

NAGA tries to manufacture standing under the guise of the Agreement, a contract that ostensibly gives Massapequa the right to use the Chiefs mascot.  But the Agreement is nothing more than a fiction.  NAGA has no right to the Chiefs mascot.  It does not own it or have a trademark on it.  NAGA has no greater right to license the Chiefs mascot than a random member of the public.  NAGA uses the Agreement to give Massapequa something NAGA does not possess, own, or have any right to control.  In legal terms, it gives no consideration to Massapequa, which means the Agreement is an empty piece of paper.  Its obligations and benefits are illusory and nonexistent; the Agreement exists as a contract in name only, a clever yet facile and "thinly veiled attempt to circumvent the limits on . . . standing."  *Murthy*, 603 U.S. at 76.  And this

problem encumbers every one of NAGA's claims, including its First Amendment allegations.

NAGA argues it has authorized Massapequa to use "Indigenous NIL [Name, Image, and Likeness] for all school-related purposes," including "athletic uses," in exchange for Massapequa's commitment "that it will continue to use the 'Chiefs' name and logo as the District's official name and logo for all school related purposes."[19]  (*Id.*). Should Massapequa discontinue its Native American educational programming or fail to use the Chiefs mascot, NAGA's authorization permitting Massapequa to use "Indigenous NIL rights will automatically be withdrawn."  (*Id.*).  But if that happens, NAGA "will have no cause of action of any kind" to compel Massapequa to comply with the terms of the Agreement.  (*Id.*).  And if Part 123 invalidates the Agreement, either party may cancel the contract.  (NAGA Agreement ¶ 5).

---

[19] While the Agreement refers to NIL generally, neither NAGA nor Massapequa have identified any NIL other than the Chiefs mascot that NAGA would purportedly permit Massapequa to use.  The Agreement itself, and the parties' briefing, make plain that the only NIL the Agreement refers to is the Chiefs mascot.  (*See* NAGA Agreement ¶ 4 ("This Agreement constitutes the full agreement between the parties with regards to the terms and conditions pursuant to which NAGA . . . permit[s], consent[s] to, support[s], and authorize[s] the District in its continued use of its current Indigenous name, mascot, and logo.  No other promises or agreements have been made."); *e.g.*, NAGA Pls.' Opp'n at 5 ("The Agreement . . . required the District's continued use of Native name, imagery and likeness ('NIL') in connection with its educational and athletic programming, e.g. continuing the traditions of 'the Massapequa Chiefs.'")).

This language may sound like a contract, but it is not.  "[A] contract is a promise supported by consideration and, in the case of a bilateral contract such as this,[20] the promise of each party must be based upon valuable consideration." *Curtis Props. Corp. v. Greif Cos.*, 212 A.D.2d 259, 264 (1st Dep't 1995).  Each side in a bilateral contract must provide consideration to the other in return for the promised performance.  *Id.*; *Kowalchuk v. Stroup*, 61 A.D.3d 118, 125 (1st Dep't 2009) ("In fact, the consideration for a bilateral contract such as this one, in which promises are exchanged, consists of the acts mutually promised."); *Greater Buffalo Press, Inc. v. Harris Corp.*, No. 85-CV-1404E, 1988 WL 85943, at *2 (W.D.N.Y. Aug. 15, 1988) ("A bilateral contract, . . . is one where the promiser requires a promise from the promisee instead of an act; the formation of the contract being when the mutual promises are exchanged.").  "Consideration is defined as either a bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor."  *Greenberg v. Greenberg*, 646 F. App'x 31, 32 (2d Cir. 2016).  Of course, the Court does "not ask whether the thing which forms the consideration does in fact benefit the promisee or a third party, or is of any substantial

---

[20] The Second Restatement walks back the terms "unilateral" and "bilateral" as an unhelpful distinction, Restatement (Second) of Contracts § 1, cmt. f (1981); generally speaking, "[a] unilateral contract results from an exchange of a promise for an act, while a bilateral contract results from an exchange of promises.  Because a unilateral contract is one in which no promisor receives a promise as consideration for their promise, only one party is bound."  1 Williston on Contracts § 1:18 (4th ed.).  The Agreement here is bilateral, since both sides make promises to each other: Massapequa promises to keep using the Chiefs and to maintain its educational programming, and NAGA promises to authorize Massapequa's use of the Chiefs.  In contrast, the prototypical examples of a unilateral contract are an option contract or a right of first refusal—where one party is bound but the other is not and there is "no obligation to perform."  *Berardi v. Berardi*, No. 22-CV-0159, 2023 WL 4544625, at *4 (N.D.N.Y. June 12, 2023), *aff'd*, No. 23-1011, 2024 WL 1269902 (2d Cir. Mar. 26, 2024).

value to anyone." *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464-65 (1982); *see also Hamer v. Sidway*, 124 N.Y. 538, 546 (1891) ("Consideration means not so much that one party is profiting as that the other abandons some legal right in the present or limits his legal freedom of action in the future as an inducement for the promise of the first.").

Under the Agreement, on the one hand, Massapequa is receiving the supposed right to use the Chiefs mascot, in return for agreeing to provide the Native American education outlined in Exhibit A.  On the flip side, NAGA is receiving the benefit of that education, in return providing Massapequa rights to use the mascot.

But NAGA provides no consideration to Massapequa under the Agreement. Why?  Whether measured in money, legal forbearance, or any other detriment, NAGA gives up nothing when providing "rights" to use the Chiefs mascot.  NAGA does not own, license, or have any relationship to the current Chiefs mascot.  NAGA contends it need not have a trademark for the mascot to contract for it.  (NAGA Pls.' Opp'n at 10–11).  True, but it must have *some* relationship to it, otherwise its "permission" is a gratuitous gesture without any legal effect.  There is no detriment to NAGA from its promise to give the Chiefs mascot to Massapequa—it imposes no burden on NAGA, however measured, because the Chiefs mascot is not theirs to authorize, license, or convey.  To be a contractual promise with consideration, the promise "must be of some value, or at least not merely empty formal words[.]"  *Nassau Supply Co. v. Ice Serv. Co.*, 252 N.Y. 277, 280 (1929).  The Agreement is akin to one where a Hellenic society dedicated to celebrating ancient Greek and Roman mythology enters into a "contract" with Nike to permit the company to use its name.  Perhaps a nice symbolic moment, but

not a contract in any jurisdiction.  *See McCarney v. Scott*, 146 F.2d 624, 626 (2d Cir. 1944) (Hand, J.) ("That promise was without consideration, and created no contract.  Indeed, it may have been no more than a generous gesture.").

Massapequa's promises to conduct educational programing and to continue to use the Chiefs mascot are also fictional.  In an ordinary contract, a party's agreement to take some action—even if not measured in monetary cost—can be consideration, if the party is forgoing some legal right or freedom to act.  So theoretically, Massapequa's giving up its right to discontinue its existing educational programming, and its agreement to use the Chiefs mascot, could count as consideration.  And furthermore, Massapequa's promise to use the Chiefs mascot likely imposes a different burden—it would be done in contravention of Part 123, which subjects it to loss of funding.

But these are not real promises.  Why not?  Massapequa's promises to use the Chiefs mascot and provide Native American-related education are entirely optional.  Either can be discontinued at Massapequa's discretion, at any time, of its own accord, without penalty.  Should that occur, NAGA's authorization to use the Chiefs mascot is *automatically* withdrawn.  (*See* NAGA Agreement ¶ 1 ("In the event that the District discontinues all the educational programming . . . or fails to continue to use the 'Chiefs' name . . . NAGA's . . . authorization for the District's continued use of its Indigenous NIL rights will automatically be withdrawn[.]")).  Because of the automatic withdrawal, the moment Massapequa stops using the Chiefs mascot, it no longer has any rights from NAGA to use the Chiefs mascot.  Therefore, it could not be in breach of any obligation to use the mascot.  Furthermore, should Massapequa cease its educational

programming, NAGA cannot compel Massapequa to change course.  (*Id.* ("NAGA will have no cause of action of any kind and nature to compel or require the District to provide any kind of educational programming or instruction.")).  Neither party can sue the other for breach should Part 123 invalidate the Agreement, because the breaching party can just cancel the contract.  (NAGA Agreement ¶ 5).  In other words, should Massapequa cease its own performance, by stopping use of the Chiefs mascot, or discontinuing its educational programming, NAGA could not claim breach.

Such arrangements are nothing but illusory promises, *i.e.*, promises that cannot support a contract.  *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1120 (10th Cir. 2010) (noting an illusory promise exists "where the promisor retains an *unlimited* right to decide later the nature or extent of his or her performance.  This *unlimited* choice in effect destroys the promise and makes it illusory." (quoting 1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 4:27, at 804–05 (4th ed. 2007))); Restatement (Second) of Contracts § 77a (1981) ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise.").[21]

 "It is crystal clear that, where there is no consideration flowing from one party to a contract . . . there is no contract."  *Mfrs. Tr. Co. v. Kennedy,* 291 F.2d 460, 469 (2d Cir.

---

[21] "[A]n interpretation that renders a contract illusory and therefore unenforceable is disfavored and enforcement of a bargain is preferred, particularly where . . . the parties have expressed their intent to be contractually bound in a writing."  *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 495 (S.D.N.Y. 2023).  The interpretation here, though, is not one possible understanding among several caused by ambiguous terms.  It flows from the only plain reading of the Agreement.

1961).  The Agreement is not a contract and is unenforceable, and thus, its invalidation cannot be the basis of an injury that gives rise to any claim.  *See Associated Builders & Contractors W. Penn. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 288 (3d Cir. 2023) ("While Plaintiffs are right that the size of the injury is irrelevant, whatever mere 'trifle' is alleged, must still be legally cognizable." (citation omitted)); *cf. California v. Texas*, 593 U.S. 659, 671 (2021) ("Here, there is no action—actual or threatened—whatsoever. There is only the statute's textually unenforceable language.").

A separate problem with NAGA's standing is that it misinterprets Part 123.  Part 123.4(b) provides a safe harbor to existing contracts entered into between tribal nations and public schools that permit the use of an Indigenous mascot.  If such a contract exists, Part 123.2—which prohibits the use of a mascot—does not apply to the public school.  The school may continue to use the mascot, but cannot accept nor offer anything of value or consideration for doing so.  8 NYCRR § 123.4.

From this safe harbor, NAGA assumes that Part 123 invalidates or nullifies all other contracts a public school executes after the effective date, whether with a tribal nation or anyone who licenses an Indigenous mascot.  (NAGA Pls.' Opp'n at 4–5).  But on its face Part 123 does no such thing.  There is no provision of Part 123 that effectuates an invalidation of contracts that fall outside the safe harbor.  It may be that a public school could not in good faith enter into such an agreement, knowing that the school was subject to Part 123, but that does not mean that the contract is per se invalid by the force of the regulation.

This misapprehension means NAGA lacks standing.  NAGA is not a directly regulated party or entity under Part 123, and the Agreement is not automatically invalidated or nullified by the regulation.  The Board of Regents has not taken any action against and has not asserted any power to regulate associations like NAGA, Indigenous tribes, or their members, and NAGA does not explain how the Board of Regents could take steps to invalidate the Agreement.  To be sure, Massapequa may not be able to comply with the Agreement because of its obligations under Part 123.  But in that case, NAGA's injury from Massapequa's inability to comply is not traceable to Defendants' conduct, but to Massapequa's, which can opt to (or not) comply with the Agreement (or Part 123).  *Cf. Fiore v. Univ. of Tampa*, 568 F. Supp. 3d 350, 367 (S.D.N.Y. 2021) (denying parents standing to sue university where any economic injury was traceable to the parent-child arrangement for payment of tuition, not to the parent-university relationship).

Consequently, any injury claimed from invalidation of the Agreement is nonexistent, and that impedes most of NAGA's claims, except the equal protection and First Amendment claims, for which they raise other theories of injury.  The Court addresses these in turn.

   b. <u>NAGA's Assertion of its Members' First Amendment Injury</u>

NAGA tries to bring a First Amendment claim under Section 1983 on behalf of its members, including Finkenbinder.  (NAGA Compl. ¶¶ 139–50).  But it cannot, even if its members or Finkenbinder are injured.  "[I]t is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case

brought under 42 U.S.C. § 1983." *A.H. ex rel. E.H. v. New York State Dep't of Health*, 147 F.4th 270, 277 n.2 (2d Cir. 2025) (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)).

So the only First Amendment claim that NAGA could bring must arise out of its own injury. *See Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021) ("An organization may nonetheless bring 'a § 1983 suit on its *own* behalf so long as it can independently satisfy the requirements of Article III standing.'" (citation omitted)).

c.    NAGA and Finkenbinder's Other First Amendment Injury

Part 123 governs the mascots a school district may use. NAGA and Finkenbinder's other alleged First Amendment injury is indirect; they claim they are harmed because others cannot use the Chiefs mascot, and they are deprived as a result.

Like the theory of standing rejected by the Supreme Court in *Murthy*—where the plaintiffs, five social-media users, claimed that they had a "right to listen" injury from the censorship of various online platforms—NAGA's injury claim is "startlingly broad." 603 U.S. at 75. It would give anyone interested in the Chiefs mascot, wherever they may be located or whoever they may be, "the right to sue over *someone else's* censorship." *Id.* Whatever the right to associate and receive information, ideas, and messaging conveyed by the use of the Chiefs mascot by Massapequa, the Board, or their employees, NAGA and Finkenbinder only suffer a legal injury if they have "a concrete, specific connection to the speaker." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)).

The Agreement does not establish that connection. For one thing, it is not an actual contract. *See supra* pp. 50–56. For another, there is a redressability problem if NAGA uses the Agreement to establish standing. If NAGA and Finkenbinder did have

standing to challenge Part 123.4(b), which they allege invalidates the Agreement and frustrates their ability to advance the organization's core mission, (NAGA Pls.' Opp'n at 6), they would not have free rein to challenge and invalidate the rest of Part 123, as they wish to do.  And as a result, invalidating the part of the law that impacts the Agreement would leave in place the other provisions that bar use of the Chiefs mascot, which NAGA has no standing to challenge.  "The fact that a plaintiff has suffered an injury that is traceable to one kind of conduct does not grant that plaintiff standing to challenge other, even related, conduct," since "standing is not dispensed in gross." *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015) (quotations omitted); *e.g.*, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733–34 (2008) ("The fact that Davis has standing to challenge § 319(b) does not necessarily mean that he also has standing to challenge the scheme of contribution limitations that applies when § 319(a) comes into play.").  In standing parlance, NAGA and Finkenbinder's First Amendment injury — the inability to enjoy the use of the Chiefs mascot — is not redressable by its challenge to Part 123.4(b); their inability to appreciate and associate with the Chiefs mascot is affected by other portions of the law.  (*See, e.g.*, Aff. of David Finkenbinder dated Aug. 7, 2025 ("Finkenbinder Aff."), attached to NAGA Pls.' Opp'n as Ex. A, Dkt. 25-1 ¶ 7; Aff. of Frank Black Cloud dated Aug. 7, 2025 ("Black Cloud Aff."), attached to NAGA Pls.' Opp'n as Ex. B, Dkt. 25-2 ¶¶ 9–11; Aff. of Eunice Davidson dated Aug. 7, 2025 ("Davidson Aff."), attached to NAGA Pls.' Opp'n as Ex. C, Dkt. 25-3 ¶¶ 4–6, 13). A judicial decision in its favor invalidating the contract-related provision would leave the rest of Part 123's restrictions on Massapequa's use of the mascot in place.

The NAGA Plaintiffs try to cure this problem by relying on Finkenbinder's injury, which is broader and does not rely on the Agreement. (NAGA Pls.' Opp'n at 7–8). Finkenbinder claims Part 123 violates his free speech rights because it "excludes him (and other sharing his heritage) from having their history and ancestry recognized," (NAGA Compl. ¶ 19), and "excludes [him] . . . from school-sponsored events by forbidding the display of Native names, logos, or imagery, except as approved classroom discussion topics," (NAGA Pls.' Opp'n at 7). But Finkenbinder is not directly regulated by Part 123. Should he wish to use, wear, or display the Chiefs mascot at Massapequa sports games or school functions, Part 123 has nothing to say about that. The regulation does not govern or impact the behavior of private citizens who are not affiliated with Massapequa (by virtue of being employed by or a student in the District). Finkenbinder's indirect First Amendment injury is even more attenuated than NAGA's injury. He claims a First Amendment right to associate with the Chiefs mascot at school functions, (*id.*), but he has no relationship to Massapequa—he is not employed by the District, a parent of a child in a District school, or a member of its Board. So, he lacks the requisite injury for standing, because he lacks the necessary connection to the speaker. *Murthy*, 603 U.S. at 75.

Finkenbinder then tries a different tact, claiming that he has general taxpayer standing. (NAGA Pls.' Opp'n at 7; NAGA Compl. ¶ 19; *see* also Finkenbinder Aff. ¶¶ 6–8). With few exceptions never raised by NAGA or relevant here, status as a state taxpayer does not confer standing. *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) (rejecting federal taxpayer standing because the interest is "too

generalized and attenuated to support Article III standing"); *DaimlerChrysler*, 547 U.S. at 345 ("The foregoing rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers."); *Bd. of Educ. of Mt. Sinai Union Free Sch. Dist. v. New York State Tchrs. Ret. Sys.*, 60 F.3d 106, 110 (2d Cir. 1995) ("State taxpayers, like federal taxpayers, do not have standing to challenge the actions of state government simply because they pay taxes to the state.").  Though Finkenbinder cites a variety of cases for the proposition that New York state law permits taxpayer standing, federal courts are of limited jurisdiction, and state standing doctrine cannot overcome those federal limitations.  *Hollingsworth*, 570 U.S. at 714–15.  Since Finkenbinder does not have standing, even if NAGA could bring § 1983 claims on behalf of its members, it could not do so here.  *Citizens United to Protect Our Neighborhoods v. Vill. of Chestnut Ridge, New York*, 98 F.4th 386, 395 (2d Cir. 2024) ("[S]ince we have already concluded that none of the Individual Plaintiffs has standing under any of those theories, CUPON's derivative claims of associational standing must also fail.").

In summary, the Agreement does not give rise to a cognizable injury, because it is an illusory contract.  Even if it were not, the Agreement could only help NAGA challenge one section of Part 123, which would not redress its claimed injury to its benefitting from others using the Chiefs mascot.  As for a theory of injury based on a right to associate with the Chiefs mascot, without any connection to Massapequa, NAGA and Finkenbinder have no standing.  And Finkenbinder's taxpayer status does not give him standing, either.

3.    <u>Caramore</u>

Caramore has three free speech claims in the *Massapequa* action brought in her individual capacity: the overbreadth and political speech causes of action, as well as another claim that Part 123 violates the First Amendment by unlawfully compelling or restricting her speech.  (Massapequa PAC ¶ 128).  The Court already granted Caramore leave to amend First Amendment claims in her individual capacity.  *Dismissal Order*, 2025 WL 929710 at *35.  Defendants do not challenge her standing to bring any of these claims.

Caramore asserts she is an official of the District whose conduct and expression is directly regulated by Part 123.  *E.g.*, 8 NYCRR § 123.5 (prohibiting "school officers and employees when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot").  She continues to wear Chiefs apparel, in part, "to protest Part 123" and "support the District's ongoing fight to maintain the Chiefs name and logo."  (Massapequa PAC ¶¶ 153–54).  As a current Board member, she is subject to removal from her position for noncompliance with Part 123.  *See* Part 123 FAQ at 9; N.Y. Educ. Law § 306.

Caramore brings her political speech claim as an incumbent candidate for School Board—again, a position directly regulated by Part 123.  She "intends to seek re-election during the next eligible election cycle," but she is not a member of a tribal nation, and thus not exempt from Part 123's prohibition on using or promoting any Indigenous mascot on school property or at a school function.  (Massapequa PAC ¶ 178).  She "plans to engage in expressive and speech conduct by wearing apparel bearing the

62

'Chiefs' name and logo—representing the school's historical identity—and by distributing campaign materials featuring the same," but Part 123 forbids her from doing so.  (*Id.* ¶¶ 179–80).  Caramore, then, unlike NAGA or Finkenbinder (or an unnamed, unidentified member of the public or Board), has shown her "personal stake" in this dispute—and that she is not a "mere bystander."  *Diamond Alt. Energy*, 145 S. Ct. at 2133.

Thus, the Court grants the motion to amend to permit Caramore to bring the overbreadth, free speech, and political speech causes of action in her individual capacity.[22]

The First Amendment claims of Massapequa and the Board (including any brought by Caramore in an official capacity), as well as all of the NAGA Plaintiffs, are dismissed.

---

[22] Both sides suggest that once these First Amendment issues reach the merits, the answers will be simple and straightforward.  But they are knotty and difficult.  *Compare Latino Officers Ass'n N.Y., Inc. v. City of New York*, 196 F.3d 458, 463 (2d Cir. 1999) ("[T]he government 'may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large.'" (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465 (1995))), *with id.* at 468 ("[N]ot all speech by a government agent is 'government speech' . . . even when a government agent represents he is speaking as a representative of the government body, that agent may have independent rights under the First Amendment.").  This decision does not say anything about Caramore's claims on the merits.  "This case concerns only standing, not the merits.  [She] may or may not prevail on the merits[.]"  *Diamond Alt. Energy*, 145 S. Ct. at 2141.

B.      NAGA's Equal Protection Claim

Only the NAGA Plaintiffs challenge Part 123 on equal protection grounds,

alleging a violation of the Fourteenth Amendment.[23]  (NAGA Compl. ¶¶ 125–38).  Part

123 bans the use of names, symbols, or images only of Indigenous cultures—but no

other group—when used to represent public schools.  *See* 8 NYCRR § 123.1.  The law

singles out and bans Indigenous mascots, but not those of other races or ancestries.[24]  It

also permits a New York State recognized tribal nation to use certain mascots for its

sports teams composed of tribal members, including those who attend a tribal school.

*Id.* § 123.4(a).  But non-tribal nation schools cannot use the identical mascot.  Part 123

extends the benefit of using the mascot to schools based on their status as a tribal

school.  And finally, the regulation establishes a safe harbor for contracts concerning

Indigenous mascots, between a recognized tribal nation and a public school, before a

---

[23] NAGA is foreclosed from bringing this claim, pled under Section 1983, on behalf of its members, but it may bring the claim on behalf of the organization itself. *A.H. ex rel. E.H.*, 147 F.4th at 278; *Conn. Citizens Def. League*, 6 F.4th at 447; *supra* pp. 57–58.

[24] Part 123.1 may be a classification based on ancestry.  *See Rice v. Cayetano*, 528 U.S. 495, 514 (2000).  That being said, because "[a]ncestry can be a proxy for race," *id.*, it may well need to satisfy strict scrutiny and raise a "serious" equal protection problem. *Haaland v. Brackeen*, 599 U.S. 255, 333 (2023) (Kavanaugh, J, concurring).  The other provisions, however, could be read as classifications based on tribal status, or membership in a tribe, which has been considered a political, not racial classification. *See, e.g., Rice*, 528 U.S. at 519–20.  And if they are political, not racial classifications, they are subject to a rational basis review, though that question is hardly settled.  *Compare Haaland*, 599 U.S. at 310 (2023) (Gorsuch, J. concurring) (citing *Morton v. Mancari*, 417 U.S. 535, 553 n.24, (1974)), *with Malabed v. N. Slope Borough*, 42 F. Supp. 2d 927, 938 (D. Alaska 1999) ("[C]haracterizing Native American interests as political rather than racial or ethnic does not automatically result in a lower level of scrutiny being used."), *aff'd*, 335 F.3d 864 (9th Cir. 2003).

certain date—a classification based on the content of the agreement, the contracting party's status as a tribal nation, and the date of execution.[25]  *Id.* § 123.4(b).

Whether these classifications violate equal protection standards must await a later day, because NAGA is not injured by any identified violation.  "[T]o show Article III standing for constitutionally-protected equal protection claims, a plaintiff must allege that (1) there exists a reasonable likelihood that the plaintiff is in the disadvantaged group, (2) there exists a government-erected barrier, and (3) the barrier causes members of one group to be treated differently from members of the other group."  *Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994).  "An injured plaintiff has standing to raise an equal protection claim when the state imposes 'unequal treatment' on the basis of a protected characteristic, such as race."  *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 45 (2d Cir. 2017) (quoting *Heckler v. Mathews*, 465 U.S. 728, 738 (1984)).  The discrimination injury could be "emotional or psychic, rather than monetary."  *Id.* at 50.  However, "in order to adequately plead a harm (whether psychic or monetary) based on discriminatory treatment under a statute, a plaintiff still must prove he personally would have been subject to the discriminatory terms of the law."  *Id.*

NAGA's equal protection briefing is less than pellucid.  Through the haze of constitutional case name-dropping emerge two theories of equal protection injury: first,

---

[25] Part 123 also allows employees who are tribal members to use or promote an Indigenous mascot of their tribal nation, but prohibits other employees of all other backgrounds from doing so.  8 NYCRR § 123.5.  NAGA does not challenge this provision on equal protection grounds.

NAGA is deprived of the benefit of Massapequa's use of the Chiefs mascot, which NAGA does not own or control; second, the invalidation of the Agreement can be traced to the provision of Part 123 that gives protection to some, but not all, such contracts.  (NAGA Compl. ¶¶ 129–30, 132; NAGA Pls.' Opp'n at 14).

With respect to the first theory, NAGA claims it is injured because the use of the Chiefs mascot by Massapequa is no longer permitted.  (NAGA Pls.' Opp'n at 14–15).  To be sure, "[w]hen a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision . . . was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights.  But it may make it substantially more difficult to meet the minimum requirement of Article III[.]"  *Warth*, 422 U.S. at 505 (citation omitted); *see also FDA*, 602 U.S. at 382–83 ("[U]nregulated parties may have more difficulty establishing causation . . .  [T]he 'line of causation between the illegal conduct and injury'—the 'links in the chain of causation'—must not be too speculative or too attenuated." (citations omitted)).  But in the equal protection context, "even if a governmental actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct."  *United States v. Hays*, 515 U.S. 737, 743–44 (1995) (quotation omitted); *see also Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 822 (7th Cir. 2014) ("[T]he mere fact that discrimination is occurring is not enough to establish standing, absent being 'personally denied equal treatment.'" (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984))).  Whatever salutary and positive effects NAGA claims

66

to obtain from Massapequa's use of the Chiefs mascot, the deprivation of those benefits is too remote an injury to be cognizable, especially since they do not own any rights to the mascot. [26]   NAGA is not deprived of any benefit—other than the Agreement, discussed below—by the force of Part 123; it may still use the Chiefs mascot as much or as little as it would like, even at Massapequa school events or functions.   Massapequa teachers, employees, and Board members are deprived of the benefit of using the Chiefs mascot; NAGA is not.[27]   Therefore NAGA lacks any direct equal protection injury.   *E.g.*, *Haaland*, 599 U.S at 296 ("Because Texas is not injured by the placement preferences . . . Texas therefore does not have standing to bring either its equal protection or its nondelegation claims."); *Sloan v. Michel*, No. 15-CV-6963, 2016 WL 1312769, at *7 (S.D.N.Y. Apr. 4, 2016) ("As for the equal protection claim, the Complaint does not allege that Plaintiff is in a disadvantaged group.   The Complaint generally alleges that independent and minority party voters are disadvantaged, but does not allege that

---

[26] And it is hardly obvious that a deprivation of a school's ability to use its mascot of choice (Indigenous or otherwise) could be a deprivation of a legally-protected interest.   *See, e.g.*, *Marez v. Redhorse*, No. 21-CV-2941, Dkt. No. 52 at 14–16 (D. Colo. May 5, 2022); *see also Mancari*, 417 U.S. at 554–55 (collecting cases that specifically "upheld legislation that singles out Indians for particular and special treatment").

[27] Even framed as a stigma or reverse-stigma claim, NAGA's psychic injury is not an equal protection injury, since it is not deprived of the benefit of the use of the Chiefs mascot in the first instance.   *Allen*, 468 U.S. at 755 ("Neither do they have standing to litigate their claims based on the stigmatizing injury often caused by racial discrimination.   There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing.   Our cases make clear, however, that such injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." (quotation omitted)), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

Plaintiff belongs to any of these groups or that he is a voter."), *aff'd sub nom. Sloan v. Schulkin*, 689 F. App'x 101 (2d Cir. 2017). Finkenbinder also does not allege any injury different than that claimed by NAGA—he has no equal protection injury either.

That leaves us with the Agreement and the contract injury. Contracts with tribes for Indigenous mascots are entitled to the safe harbor, but contracts with anyone else (for the same mascot) receive no protection from Part 123.4(b). The invalidation of the Agreement (or the ineligibility of the safe harbor) might be an injury, if the Agreement was, in fact, a contract. But it is not. *Supra* pp. 50–56. An illusory contract gives rise to an illusory injury, which is not concrete enough to proceed with an equal protection claim.[28] *See Doe*, 139 F.4th at 182 (denying standing to "concerned bystanders" who circumvent Article III by "exploit[ing] next friend standing to challenge state or national laws they disagree with, even though they lack a personal stake in the dispute"). Without an enforceable contract, NAGA lacks standing to bring this equal protection challenge. And Finkenbinder has no relationship to the contract—and so his contract-related equal protection injury is nonexistent, too.

C.     NAGA's Due Process Claim

NAGA and Finkenbinder also assert due process violations. (NAGA Compl. ¶¶ 151–57). Though hardly clear, the claim has several strands: that Part 123 infringes

---

[28] NAGA contends that the Agreement, executed on May 15, 2025, was valid until it was nullified by Part 123, which "did not go into effect until June 30, 2025." (NAGA Pls.' Opp'n at 19 n.9 (citing NAGA Compl. ¶ 52)). But NAGA misapprehends the regulation, which became effective on May 3, 2023, and the safe-harbor provision applies to agreements entered into prior to that that date. *See* Part 123 FAQ at 4; 8 NYCRR § 123.4(b).

substantive due process rights of school districts, and by extension, individuals, because it is so vague as to deprive them of fair notice and impose arbitrary and unequal enforcement or application,[29] (*id.* ¶¶ 153–54); and it violates procedural due process by delegating "broad interpretive and enforcement authority to local school boards without providing clear, objective, or uniform standards."[30]  (*Id.* ¶ 155).

"A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979).  And "[i]n a procedural due process challenge, the question before the court is whether the process affording the plaintiff an opportunity to participate in governmental decision-making

---

[29] NAGA fails to explain how it distinguishes its procedural due process claim from its substantive one.  "[T]he geography of due process is hilly," but for procedural due process the core is as follows: "before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner." *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (quotation omitted).  A substantive due process "claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible." *Id.*  A substantive due process violation exists when some "constitutional line has been crossed," *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), regardless of the manner in which it was done.  Whatever the appropriate label for the claims, the NAGA Plaintiffs have no injury sufficient to assert them.

[30] In one sense, the due process claim is, at its heart, a refashioning of their First Amendment injury: the alleged vague and arbitrary enforcement of Part 123 deprives schools and employees from using the Chiefs mascot.  But that theory runs headfirst into the defective "right to listen" injury theory, *supra* p. 58; and in any event, such a claim is barred by prudential limits on third-party standing.  *See Ctr. for Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002) ("As plaintiffs do not assert a harm to their own interest in receiving due process of law, this is precisely the sort of claim that the prudential standing doctrine is designed to foreclose.  Plaintiffs cannot make their First Amendment claims actionable merely by attaching them to a third party's due process interests.").

before being deprived of his liberty or property was adequate." *Brody v. Vill. of Port Chester*, 345 F.3d 103, 112 (2d Cir. 2003).

Here, NAGA has suffered no deprivation, and is not threatened with any potential deprivation of liberty or property due to the enforcement of Part 123. The entirety of its claim is premised on the harm Part 123 inflicts on Massapequa and the Board to comply with and implement a vague mandate. These injuries do not run to NAGA, an organization not governed by Part 123. *Cf. Ctr. for Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002) ("Plaintiffs' due process claim is based on their allegation that the challenged restrictions fail to give clear notice of what political speech, public education, and law reform activities they prohibit and that they encourage arbitrary and discriminatory enforcement . . . It is not the plaintiffs, however, who are allegedly left uncertain of their rights by unconstitutionally vague language in a government provision; it is the foreign NGOs who are allegedly left in this position."). NAGA suffers no direct injury-in-fact from another's due process violation, and it therefore has no standing for this claim. *See Rynasko*, 63 F.4th at 195 ("[A]s a non-party to the contract between Emily and NYU, Rynasko lacks legally enforceable expectations about Emily's NYU educational experience. Consequently, she suffered no cognizable injury in fact when NYU suspended in-person classes, activities, and services in response to the COVID-19 pandemic."). The same is true for Finkenbinder, and this claim is dismissed for lack of standing.

D.    Dormant Commerce Clause

"The Commerce Clause provides that 'Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States.'" *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (quoting U.S. Const. art. I, § 8, cl. 3). The dormant, or negative, implication of the Interstate Commerce Clause flows from this grant of Congressional authority, which "limits the power of local governments to enact laws affecting interstate commerce." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007). "[S]tate laws offend the Commerce Clause when they seek to build up . . . domestic commerce through burdens upon the industry and business of other States[.]" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quotations omitted). The clause, therefore, "prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *Selevan,* 584 F.3d at 90 (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997)). "The term discrimination in this context 'means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Town of Southold*, 477 F.3d at 47 (quotation omitted). "A law may discriminate against interstate commerce on its face, harbor a discriminatory purpose, or discriminate in its effect." *Variscite NY Four, LLC v. New York State Cannabis Control Bd.,* 152 F.4th 47, 63 (2d Cir. 2025) (quotation omitted).

1.    Massapequa and the Board

Massapequa and the Board contend that Part 123.4(b), by exempting schools that have a written agreement with a recognized tribe within New York, violates the

71

dormant Commerce Clause. (Massapequa PAC ¶ 251). Because tribes outside of New York are not permitted to contract, they say Part 123 discriminates against out-of-state tribes. (*Id.* ¶ 254).

The potential problems of this claim as a commerce clause theory—including whether Part 123 can ever be read or understood to be a law enacted to advance local protectionism—affect the threshold injury inquiry. "A plaintiff has standing to raise a dormant Commerce Clause claim when it has sustained an injury resulting from a burden on interstate commerce." *MGM Resorts*, 861 F.3d at 45 (quotation omitted); *see also Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 58 (2d Cir. 2018) (noting that to have a dormant Commerce Clause injury, plaintiff must show that it suffers effects of discrimination against out-of-state interests). And that injury must be economic or commercial. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 267 (1984); *Selevan*, 584 F.3d at 96 ("[A] state policy that is challenged under the dormant Commerce Clause must be judged by its overall economic impact on *interstate commerce*[.]").

Massapequa and the Board's claimed injuries are a "loss of an interstate NIL contract, damage to out-of-state tribal relationships, and reputational harm," because of Part 123. (Massapequa Pls.' Reply at 15; *see also* Massapequa PAC ¶ 256). None of these suffice.

Massapequa and the Board never explain how a public school district and school board—neither of which is a commercial entity—suffer an economic or commercial injury here. (Reputational injury, by its name, is not economic.) There are numerous

problems with trying to infer that the invalidation of the Agreement creates economic injury.  As an illusory arrangement whose invalidation cannot injure NAGA, *supra* pp. 50–57, the counterparties to the deal cannot suffer an injury.  Furthermore, the entire Agreement is devoid of any commercial or economic considerations, or at least any that are articulated.  No money or similar consideration is exchanged by the parties to the Agreement.  Perhaps Massapequa intends to exploit the Chiefs mascot, but it never says so in the PAC or its papers, meaning that this is a hypothetical or speculative economic injury.

As for "out-of-state tribal relationships," Massapequa and the Board do not identify any (NAGA is not a tribe).  If they intend to enter into future relationships with non-New York tribes that are impeded by Part 123, the injury from the loss of such contracts is too hypothetical to create standing.  *See MGM*, 861 F.3d at 47 ("MGM has pleaded only that it is 'interested' in exploring development opportunities . . . . It has not alleged any concrete plans to enter into a development agreement[.]").

The PAC also claims NAGA is injured as an out-of-state entity disadvantaged by Part 123.  (Massapequa PAC ¶¶ 248, 251–53).  But Massapequa and the Board cannot claim NAGA's injuries as their own to try to get standing.  *See, e.g.*, *L.A.M. Recovery, Inc. v. Dep't of Consumer Affs.*, 377 F. Supp. 2d 429, 438 (S.D.N.Y. 2005) (finding no standing where "the contention that the application of the ordinance to out-of-state tow operators runs afoul of the dormant Commerce Clause is an assertion by LAM, a New York City entity, of the alleged rights of out-of-staters"), *aff'd*, 184 F. App'x 85 (2d Cir.

73

2006).  Without the required standing, Massapequa and the Board cannot assert this claim.

        2.    <u>NAGA Plaintiffs</u>

For all their discussion of a "competitive market," (NAGA Pls.' Opp'n at 23–24), the NAGA Plaintiffs fail to allege any sort of commercial or economic injury to them, separate from the invalidation of the Agreement.  Even setting aside the validity problems, *supra* pp. 50–56, the Agreement does not identify any economic or commercial exchange.  At most, the Agreement memorializes an associational relationship between Massapequa and NAGA, where Massapequa's public schools educate their students about Native American history and culture, which is already being done.  There is no plausible economic or commercial activity identified by the NAGA Plaintiffs, and the invalidation of the Agreement does not amount to a dormant Commerce Clause injury that gives rise to Article III standing.

        E.    <u>Indian Commerce Clause</u>

The Commerce Clause also contains the Indian Commerce Clause: "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  Despite the common source, it is "well established that the Interstate Commerce and Indian Commerce Clauses have very different applications."  *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989).  "[W]hile the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, the central function of the Indian Commerce Clause is to provide

Congress with plenary power to legislate in the field of Indian affairs." *Id.* "The extensive case law that has developed under the Interstate Commerce Clause, moreover, is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause." *Id.*

"This congressional authority and the 'semi-independent position' of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. Second, it may unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) (quotations omitted). "A court must know who a regulation targets and where the targeted activity takes place" before conducting an Indian Commerce Clause analysis. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 112–13 (2d Cir. 2014). That is because, "the Indian Commerce Clause's grant of authority to the federal government, and preemption of state authority, extends only to activities occurring in 'Indian country,' *i.e.*, Indian lands within the territory of the United States." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 173 (2d Cir. 2005).

The threshold standing problem for all the plaintiffs is that nothing about Part 123 is a state regulation affecting activities on Indian lands. In fact, Part 123 expressly exempts Indian lands—tribal schools, sports leagues, members, and tribes' written agreements—from its reach, *see* 8 NYCRR §§ 123.4(b) & 123.5, meaning it does not

interfere with Congressional power under the Indian Commerce Clause. *E.g.*, *Grand River Enters.*, 425 F.3d at 174; *Blunk v. Arizona Dep't of Transp.*, 177 F.3d 879, 884 (9th Cir. 1999) ("In sum, the requirements for the Navajo Fee Land to be 'Indian country' are not met in this case. Because the land is not 'Indian country,' the ADOT is not preempted by the federal preemption prong of the Indian preemption doctrine from regulating Blunk's erection of billboards on the land."); *cf. Sac & Fox Nation of Missouri v. Pierce*, 213 F.3d 566, 573 (10th Cir. 2000) ("Tribes have alleged particularized imminent economic injury if the State imposes its motor fuel tax on fuel distributed to [stations on tribal land].").

### 1.    Massapequa and the Board

Massapequa and the Board allege that Part 123 denies "tribal nations the ability to contract," "intrudes on tribal affairs and commerce," and "infringes Congress's 'trust responsibility' to protect Indigenous peoples." (Massapequa PAC ¶¶ 271–73). Whatever validity this argument may or may not have, these plaintiffs are not injured. Massapequa and the Board do not allege that any activity they conduct is on tribal lands or affects tribal lands. They, therefore, do not have standing.

### 2.    NAGA Plaintiffs

NAGA's Complaint barely gestures at the fact that it is advancing an Indian Commerce Clause claim. After declaring in the preliminary statement that NAGA is bringing a claim under both the dormant and Indian Commerce Clauses, (NAGA Compl. ¶ 2), the Indian Commerce Clause claim never appears again, save a single reference alleging that the Indian Commerce Clause "has been interpreted to mean that

only the Federal government can regulate Indian tribes or their economic activities," (*id.* ¶ 159). These passing references do not allege standing sufficient to bring the claim (one whose contours are barely present).

NAGA's briefing alleges three ways that Part 123 violates the Indian Commerce Clause: 1) it "prohibits all post-May 3, 2023 agreements between school districts and tribal nations," 2) "it renders unlawful any agreement that involves 'consideration,' thereby nullifying basic elements of contract law essential to tribal commerce and cultural licensing arrangements," and 3) "it effectively regulates and restricts tribal commerce and identity—such as NIL—that is deeply intertwined with tribal lands, sovereignty, and intertribal cooperation across state borders." (NAGA Pls.' Opp'n at 29). In sum, NAGA is claiming either that that its ability to contract for its name, image, and likeness is a right protected by the Indian Commerce Clause that is infringed by Part 123, or that the rights of tribal nations to contract with public schools is violated by Part 123. It cannot proceed on either theory—even if these allegations were in its complaint. These allegations sound in general Interstate Commerce Clause injury, not under the Indian Commerce Clause, which requires some relationship to activities on tribal land.

Specifically, with respect to the first theory, based on the right of tribal nations to contract with school districts, NAGA is not, itself, a tribal nation (or a school district) conducting activities on tribal lands, and it does not identify any tribal-nation members conducting such activities that would be impacted by Part 123. Therefore, NAGA lacks both direct and associational standing to pursue this claim under the Indian Commerce

Clause.  As for NAGA's other theories about Part 123's impact on contracts related to licensing of tribal-affiliated material, or "tribal commerce," without any nexus to how these activities take place on Indian lands, there is no Indian Commerce Clause injury. (And there is the ever-present problem of the illusory contract, *see supra* pp. 50–56, that cannot serve as the basis for NAGA's injury.)  Finkenbinder, who also sues individually, is a tribal member who might possibly articulate some connection between his activities and tribal lands.  But he does not.  Thus, both NAGA and Finkenbinder lack standing for their Indian Commerce Clause claim.[31]

F.    Title VI and Title VII Claims

None of the Plaintiffs in the two cases are protected directly by the statutes they seek to challenge.  They are not employees protected by Title VII's prohibition on discrimination in employment and they are not recipients of federal educational funding protected by Title VI (students are).  Normally, that would preclude their ability to bring a claim under either law, unless they seek to invalidate a state law because it conflicts with the obligation to comply with the dictates of federal law.  Such preemption challenges are enabled by the Supremacy Clause: "Under the Supremacy Clause of the Constitution, state and local laws that conflict with federal law are

---

[31] "When the party suing is a Native American tribe, actual infringements on the tribe's sovereignty constitute a concrete injury sufficient to confer standing . . . based on the substantive interest which Congress has sought to protect in tribal self-government. This rule exists because tribes, like states, are afforded 'special solicitude in a court's standing analysis.'"  *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 357–58 (S.D.N.Y. 2013) (quotations omitted), *aff'd*, 769 F.3d 105 (2d Cir. 2014).  But NAGA is not a tribe.

without effect." *Figueroa v. Foster*, 864 F.3d 222, 227 (2d Cir. 2017) (quoting *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103-04 (2d Cir. 2010)).

A party seeking to preempt a state law or obligation must still allege a "sufficient injury in fact" to confer standing—not anyone can assert that the state law runs contrary to the federal one. *E.g.*, *Tong*, 930 F.3d at 73–74 (analyzing Article III standing before evaluating New Haven's preemption challenge to Federal Aviation Act); *State of Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 444 (D.C. Cir. 1989) ("Inasmuch as this preemptive effect is the injury of which petitioners complain, we are satisfied that the States meet the standing requirements of Article III."). Massapequa, the Board, and NAGA fail to do so for the Title VI claim, and Massapequa and the Board have not established preemption standing for their Title VII claim.

### 1.   Title VI Claims

"Title VI provides that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (quoting 42 U.S.C. § 2000d).

### a.   Massapequa and the Board

Massapequa and the Board assert that Part 123 violates Title VI in three ways: 1) it compels them to discriminate via the elimination of Indigenous mascots; 2) it coerces discrimination in contracting via the invalidation of the Agreement; and 3) it "mandates adverse treatment of certain Indigenous school officers and employees by

79

barring their use or promotion of culturally affiliated imagery on school property."
(Massapequa PAC ¶ 189).  They claim Title VI preempts Part 123 because it prohibits
race discrimination and Part 123 requires it.  (*Id.* ¶ 212).  And the District, forced to
comply with both, cannot do so.

   This standing theory fails, because there is no imminent or actual, non-
hypothetical, chance that the federal government will contend that Massapequa or the
Board is violating Title VI, should they comply with Part 123.  *See Kearns v. Cuomo*, 981
F.3d 200, 207 (2d Cir. 2020) ("A plaintiff has standing to make a preenforcement
challenge when . . . prosecution under an allegedly unconstitutional statute is not
imaginary or wholly speculative." (quotations omitted)).  Indeed, quite the opposite.
As these Plaintiffs proclaim over and over again, (*Massapequa*, Pls.' Mem. in Supp. of
Mot. to Amend dated May 19, 2025 ("Massapequa Pls.' Mot. to Amend"), Dkt. No. 66 at
11–12; Massapequa Pls.' Reply at 3, 17), the federal government has launched an
investigation into Part 123—but that investigation is directed at New York State and the
Board of Regents.  And the federal government has found that these parties (*i.e.*, the
*Defendants* in the case)—not Massapequa or the Board—are violating Title VI, by
implementing Part 123.  *See* Press Release, Secretary McMahon Visits Massapequa High
School, Announces Finding in School Mascot Probe (May 30, 2025) ("U.S. Department
of Education's Office for Civil Rights (OCR) has concluded its investigation into the
New York Department of Education and the New York State Board of Regents (the
Board).  OCR determined that the Board has violated Title VI of the Civil Rights Act
(1964) by banning the use of Native American mascots and logos by school districts in

the state of New York.").[32]  The federal government then proposed an agreement for the New York Department of Education and Board of Regents to voluntarily resolve the noncompliance finding—the alternative being referral to the U.S. Department of Justice for enforcement proceedings and potential loss of federal funding.  *Id.*  The enforcement penalties spelled out in the press release Massapequa and the Board point to clearly run against the State (the SED and the Board of Regents).  *Id.*

Massapequa and the Board have identified no such risk of enforcement by OCR or the Department of Justice against *them*.  So, in what would be a curious posture, the Defendants might have standing to bring a pre-enforcement challenge.  But Massapequa and the Board, having shown no threat of enforcement of Title VI against them—and indeed, having pointed out the opposite—have no standing to bring a preemption challenge to Part 123.

b.   NAGA Plaintiffs

The NAGA Plaintiffs have a different Title VI standing problem.  They may bring this claim against both the Board of Regents and the Regents members in their official capacities, since neither is protected by sovereign immunity, *supra* at pp. 34–35, but in any event, the claim fails for lack of injury.  The NAGA Plaintiffs argue that they have standing because public school districts receive federal funds and Part 123 excludes Native representation in school programs and activities.  (NAGA Pls.' Opp'n at 12). NAGA is a bystander: a private actor with an interest in the effects of Part 123 and Title VI's potential conflict.  NAGA is not a recipient of or applicant for federal funding or

---

[32] The Press Release is available at: https://perma.cc/Y94B-KTH6.

potentially subject to enforcement of Title VI by the federal government or enforcement of Part 123 by New York.  And although Title VI does contain a private right of action, *Bloomberg v. New York City Dep't of Educ.*, 119 F.4th 209, 214 (2d Cir. 2024), NAGA's lack of injury precludes it from bringing a preemption challenge under Title VI—even if the federal government were to conclude that Massapequa violates Title VI by complying with Part 123.

NAGA might have standing if it had a student (or parent) member that would be subject to a loss of federal funding because of Massapequa's compliance with Part 123 (of course, that student is unlikely to face an imminent harm, given the federal government's position, *supra* pp. 80–81).  All NAGA says in this regard is that it "brings this action on behalf of itself and its members, who include Native American students, parents, educators, and community leaders directly impacted by the enforcement of Part 123 in the State of New York."  (NAGA Pls.' Opp'n at 26).  Conclusory assertions that some unidentified members of NAGA, somewhere in the state of New York, have been "directly impacted" by Part 123 are simply not an injury that is "concrete, particularized, and actual or imminent."  *Murthy*, 603 U.S. at 57.

### 2.    Massapequa's Title VII Claim

"Title VII of the Civil Rights Act of 1964 'prohibits employment-related discrimination on the basis of race, color, religion, sex, or national origin and retaliation against employees who complain about discrimination.'"  *Tassy v. Buttigieg*, 51 F.4th 521, 529 (2d Cir. 2022) (citation omitted).

Massapequa and the Board claim that Part 123 "directs school districts to discriminate against certain Indigenous people with respect to the terms, conditions, and privileges of their employment because of their race and national origin." (Massapequa PAC ¶ 215).  Specifically, they note that Part 123.5 requires them to prohibit employees on school property or at school functions from using an Indigenous mascot, but exempts tribal employees using the identical mascot if it is for their tribe. (*Id*. ¶¶ 221–22).  And to comply and enforce the provision, it would have to violate Title VII by singling out employees by Indigenous, or non-Indigenous backgrounds.  (*Id.* ¶¶ 225–26).

This injury—a putative conflict with implementing Part 123.5 and also not engaging in race-based discrimination under Title VII—is pure conjecture and not concrete enough to confer standing.  "In every case—representative standing or otherwise—the complaint must clearly allege facts demonstrating that there is a real party in interest who has suffered (or will suffer) an injury[.]"  *Doe*, 139 F.4th at 181. (quotations omitted).

Massapequa and the Board admit they know of no potentially impacted employee and they do not and cannot ascertain the tribal status of their employees. (Massapequa PAC ¶ 225).  Nor do they identify any employee who wears apparel with an Indigenous mascot or plans to do so.  This defeats standing.  *Cf., e.g.*, *Doe*, 139 F.4th at 181 ("Even if FASORP was not required to name names, Article III required it to allege *some* details about who the allegedly injured scholars were and how they were at risk of harm, such as by offering a description of concrete plans to apply for employment or

submit an article, or by showing that there were members who are able and ready to submit articles or to seek faculty positions." (citation modified) (quoting *FASORP*, 11 F.4th at 76–77, 79)); *Lacewell*, 999 F.3d at 143.

Nonetheless, Massapequa and the Board cite *California Federal Savings & Loan Association v. Guerra* in support of their preemption-based standing. (Massapequa Pls.' Reply at 9). It provides them no succor. In *Guerra*, the Supreme Court reached the merits of a Title VII preemption claim brought by an employer, rejecting the argument that California law required employers to violate Title VII by providing benefits to pregnant workers. 479 U.S. 272, 291 (1987). But there, the employer initiated the litigation in federal court after 1) an employee unsuccessfully attempted to return to work following state-mandated pregnancy leave; 2) the employee filed an administrative complaint against the employer; and 3) the responsible state agency charged the employer with violating state law. *Id.* at 278. The employer sued in federal court before it was scheduled to appear before the state agency, claiming it would be subject to lawsuits from male employees asserting that Title VII barred reverse sex discrimination if the company complied with the state law. *Id.* Massapequa and the Board are a far cry from the employer in *Guerra*, which was in the direct throes of an employee's Title VII complaint. To be sure, they need not wait to be sued by an employee under Title VII, but they must show, by pleading specific facts, that there is even a single employee they would potentially have to ask to stop using an Indigenous mascot. They have not.

Massapequa and the Board then claim they face "legal liability from Title VII claims from misidentified and mistargeted employees."  (Massapequa Pls.' Reply at 11–12 (quoting Massapequa PAC ¶ 228)).  But that simply builds speculation upon speculation.  *See Lacewell*, 999 F.3d at 143; *Clapper*, 568 U.S. at 410 ("[R]espondents' theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending.").  It assumes misidentification followed by legal lawsuits, which is all conjectural.  And even if it comes to fruition, it does not appear that prohibiting employees from wearing Chiefs apparel is an adverse action that would entitle an employee to sue Massapequa under Title VII.  *Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) ("To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." (quotations omitted)); *Perard v. Jamaica Hosp. Med. Ctr.*, No. 18-CV-6661, 2020 WL 5633153, at *12 (E.D.N.Y. Sep. 20, 2020) ("Courts in the Second Circuit have found that being asked to comply with an employer's dress code is generally not considered an adverse employment action.").

Finally, they claim they have standing to assert a Title VII claim because they will "incur substantial expenses" to replace their mascot.  (Massapequa PAC ¶ 228).  That, too, is not an injury.  *See supra* pp. 46–47.

G.    Claims Under Sections 1981 and 1983

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004). "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, (2006). It follows that, where there are no rights under a contract, there can be no § 1981 claim—there is no § 1981 injury where the plaintiff lacks a contract claim in the first place. *See id.* ("Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.").

Massapequa and the Board contend that Part 123 is unconstitutional under § 1981 because it "den[ies] Indigenous peoples the 'full and equal benefit of all laws' and the right to contract."[33] (Massapequa PAC ¶ 233). NAGA and Finkenbinder bring a § 1981 challenge, too, but much like their Indian Commerce Clause claim, it appears to be included as an afterthought. It is mentioned only twice, and both times cursorily in

---

[33] "[T]he Supreme Court [has] held that 'the express cause of action for damages created by § 1983 constitutes the *exclusive federal remedy* for violation of the rights guaranteed in § 1981 by state governmental units.'" *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)). Though not pled as such in the PAC, Massapequa and the Board do "confirm that their § 1981 claim is [pled] through 42 U.S.C. § 1983," (Massapequa Pls.' Reply at 12), and the Court construes it as such. *E.g.*, *Oparaji v. Teachers' Ret. Sys. of City of New York*, No. 23-CV-5212, 2025 WL 1413912, at *5 (S.D.N.Y. May 15, 2025). The NAGA Plaintiffs do plead their Section 1981 claim under Section 1983. (NAGA Compl. ¶ 127).

86

passing, in the Complaint.  (NAGA Compl. ¶ 2; *id*. at 35).  Count I, which also sets out

NAGA and Finkenbinder's federal and state equal protection challenges, makes no

further reference to § 1981.  It does not even use the word "contract."  Having not

asserted any theory of § 1981 injury, this claim is dismissed.

To the extent Massapequa or the Board bring this claim, as the Court detailed

above, the Agreement is a fiction, and there is no contract that could give rise to a § 1981

injury.

V.    Bill of Attainder

Massapequa and the Board allege that Part 123 is an "unconstitutional bill of

attainder because it legislatively determines guilt and inflicts punishment . . . without

any judicial trial or individualized adjudication."  (Massapequa PAC ¶ 278); *see* U.S.

Const. art. I § 10.  "In its contemporary usage, the Bill of Attainder Clause prohibits any

'law that legislatively determines guilt and inflicts punishment upon an identifiable

individual without provision of the protections of a judicial trial.'"  *ACORN v. United*

*States*, 618 F.3d 125, 135–36 (2d Cir. 2010) (quoting *Selective Serv. Sys. v. Minn. Pub.*

*Interest Research Grp.*, 468 U.S. 841, 846–47 (1984)).

Massapequa and the Board are state entities that do not enjoy the protections

from Bills of Attainder.  As the Supreme Court has explained: "[C]ourts have

consistently regarded the Bill of Attainder Clause of Article I and the principle of the

separation of powers only as protections for individual persons and private groups,

those who are peculiarly vulnerable to non-judicial determinations of guilt." *South*

*Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966).  Though the provision protects

corporations, *Consol. Edison Co. of New York v. Pataki*, 292 F.3d 338, 347 (2d Cir. 2002), neither Massapequa nor the Board cite a single case extending that principle to municipal entities like school districts or their constituent boards.  *See also Nuclear Energy Inst., Inc. v. Env't Prot. Agency*, 373 F.3d 1251, 1308 (D.C. Cir. 2004) ("The Clause cannot be invoked on behalf of a State.").

And the claim fails on the merits.  "[A] law may be an attainder when it 'singl[es] out . . . an individual for legislatively prescribed punishment . . . whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons.'"  *Reynolds v. Quiros*, 990 F.3d 286, 296 (2d Cir. 2021) (quoting *Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 86 (1961)).  Part 123 does not specify any affected persons or corporations by name, identity, or in any particular way.  When a law or regulation, as is the case with Part 123, "attaches not to specified organizations but to described activities in which an organization may or may not engage," it is not a bill of attainder. *Communist Party*, 367 U.S. at 86.

<div align="center">*          *          *</div>

On October 15, 2025, the District, the Board, and Caramore, both in her official and individual capacities, joined with several additional parties to file a new third lawsuit virtually identical to the two cases already pending, represented by the same counsel.  *See* Compl., *Massapequa Union Free Sch. Dist. v. Hochul*, No. 25-CV-5791 (E.D.N.Y Dec. 15, 2025) ("*Massapequa II*"), Dkt. No. 1 at 1.  The case named some of the same Defendants that are or have been named in Massapequa's present suit—

Chancellor Young of the New York State Board of Regents and the Board of Regents itself—as well as new defendants Governor Hochul, the New York State Department of Education, and Education Commissioner Betty Rosa. *Id.* The facts and claims asserted, including claims of First Amendment overbreadth and political speech, Title VI, Title VII, Section 1981, and dormant and Indian Commerce Clause violations, are nearly identical to those in Massapequa and NAGA's existing lawsuits. The plaintiffs in this new case marked their action as related to Massapequa's, but not NAGA's, pending case. Civil Cover Sheet, *Massapequa II*, No. 25-CV-5791 (E.D.N.Y Oct. 15, 2025), Dkt. No. 1-18 at 1.

The filing raised serious concerns for the Court of possible gamesmanship to evade the procedural rules for amendment and of violations of the rule against duplicative litigation. *See* O.S.C., *Massapequa II*, No. 25-CV-5791 (E.D.N.Y Oct. 17, 2025), Dkt. No. 6 at 2–3. The plaintiffs elected to voluntarily withdraw and dismiss the *Massapequa II* action following the Court's order directing them to explain the propriety of the new case. Notice of Voluntary Dismissal, *Massapequa II*, No. 25-CV-5791 (E.D.N.Y Oct. 20, 2025), Dkt. No. 9. Since there appeared to be some confusion over general rules regarding amendment and duplicative filings, the Court briefly reiterates and clarifies some of those principles here.

The rule against duplicative litigation prevents a litigant from "claim splitting" their lawsuit into separate cases or simply filing, over and over again, the same complaint, in whole or in part, in new cases to duplicate the chances of success. *See Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504 (2d Cir. 2019) ("[A]

plaintiff has 'no right to maintain two actions on the same subject in the same court, against the same defendant at the same time.'" (quoting *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000))). This rule applies when there are the "same parties, or, at least, such as represent the same interests; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts, and the title, or essential basis, of the relief sought must be the same." *Id.* (quoting *The Haytian Republic*, 154 U.S. 118, 124 (1894)). "Like claim preclusion, the rule against duplicative litigation applies not only where there is identity, but also where there is privity, between the parties in the first- and second-filed actions." *Wang v. Ren*, No. 20-4216, 2023 WL 1977233, at *1 (2d Cir. Feb. 14, 2023) (citing *Sacerdote*, 939 F.3d at 506). Rule 16 scheduling orders, like the one in Massapequa's existing case, (*Massapequa*, Min. Entry dated Jan. 22, 2024, Dkt. No. 25), set deadlines for both amendments adding claims *and* amendments joining additional parties. *See, e.g.*, *Weisshaus v. Port Auth. of N.Y. & N.J.*, No. 21-CV-2062, 2023 WL 3603414, at *2–*3 (E.D.N.Y. May 23, 2023). Those deadlines have now lapsed in *Massapequa*. Of course, new parties *not* in privity with those in pending cases are free to assert their own claims in a new separate action if they wish to do so, with the caveat that doing so may delay resolution of Caramore's claims if the actions are related.

<u>CONCLUSION</u>

In summary, in the *NAGA* case, Defendants' motion to dismiss is granted. The NAGA Plaintiffs' Complaint is dismissed in its entirety, without prejudice, for lack of standing. In light of the dismissal, their motion for a preliminary injunction is

necessarily denied.  Where a plaintiff lacks standing to bring a claim, the Court "need not address the factors to be considered in deciding whether to award a preliminary injunction."  *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015). Instead, the Court "should deny the motion and dismiss the case for lack of subject matter jurisdiction."  *E.g.*, *Nat'l Prods. Ass'n v. James*, No. 23-CV-8912, 2024 WL 2977683, at *4 (E.D.N.Y. June 13, 2024).

The Massapequa Plaintiffs' motion to amend is denied with respect to all claims brought by the District, its Board, and Caramore in her official capacity.  Each of these claims is dismissed without prejudice for lack of standing, with the exception of the Bill of Attainder claim, which is dismissed without prejudice on the merits.  These Plaintiffs are denied leave to amend.  Plaintiff Caramore's First Amendment claims brought in her individual capacity may proceed, and as such, the motion to amend is granted with respect to these claims.

A chart summarizing the Court's rulings on the parties' claims follows this opinion as Appendix A.  Any amended complaint in the *NAGA* action must be filed by December 29, 2025.  The Clerk of Court is directed to file the Massapequa PAC, (Dkt. No. 66-2), as a separate docket entry in the *Massapequa* action.  Defendants' time to respond or otherwise move in response to the Massapequa PAC runs from the date of the Clerk's filing.

<div style="margin-left:50%;">

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge
</div>

Date:  November 14, 2025
       Central Islip, New York

APPENDIX A

| | School District | School Board | Caramore (Individual Capacity) | NAGA | Finkenbinder |
|---|---|---|---|---|---|
| **First Amendment** | | | | | |
| Overbreadth | No Standing / No Capacity to Sue | | May Proceed | Not Asserted | |
| Free Speech | Not Asserted | | | No Standing/ 11th Amendment Bar | |
| Political Speech | No Standing / No Capacity to Sue | | | Not Asserted | |
| **State & Federal Equal Protection, State Free Speech, Federal Due Process** | | | | | |
| | Not Asserted | | | No Standing/ 11th Amendment Bar | |
| **Title VI, Section 1981, Dormant Commerce Clause, Indian Commerce Clause** | | | | | |
| | No Standing | | Not Asserted | No Standing/ 11th Amendment Bar | |
| **Title VII** | | | | | |
| | No Standing | | Not Asserted | Not Asserted | |
| **Bill of Attainder** | | | | | |
| | Merits Dismissal | | Not Asserted | Not Asserted | |